T.C. Memo. 2000-53


UNITED STATES TAX COURT


ESTATE OF EILEEN KERR STEVENS, DECEASED,
DAMON R. STEVENS, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22643-97.                    Filed February 18, 2000.


<u>David W. Hettig</u> and <u>Michael E. Klingler</u>, for petitioner.

<u>Steven Walker</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $114,722.  The deficiency arose in connection with the valuation of undivided interests in real property held by decedent's estate.  The parties have settled some issues, including the fair market value of two of the three properties at issue.  The remaining issues we

consider concern the fair market value of one of the properties and the discounts, if any, to be applied to each of the three 50-percent undivided interests in real property held by decedent's estate and at issue here.

### FINDINGS OF FACT

The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Eileen Kerr Stevens (decedent) a resident of Santa Clara County, California, died testate on September 7, 1993 (valuation date). Before her death, she had been married to Roy Stevens. The couple had four children, one of whom predeceased decedent. One of those children, Damon Stevens, is the executor of decedent's estate. At the time of filing the petition Damon Stevens resided in Santa Clara County, California.

Roy Stevens predeceased decedent on May 4, 1980, and through his will, created the Roy Stevens Testamentary Trust (the Trust) with decedent as trustee. As trustee, decedent had been given the power to conduct business for the Trust, including the authority to partition the Trust property if necessary. Decedent was entitled to the entire net income of the Trust, as well as any principal necessary for her "proper support, care and maintenance" for her life. The Trust continued after decedent's death for the benefit of the Stevens children. The Trust and a subsequent trust created by decedent both were to be terminated

and any remaining assets of the trusts distributed when the youngest living Stevens child reached the age of 30.

At the time of decedent's death, decedent and the Trust each owned, as tenants in common, a one-half interest in the following properties: (1) 5100 West 123d Street, Alsip, Illinois (Kmart property); (2) 333 El Camino Real, San Bruno, California (Walgreen property); and (3) 4540 El Camino Real, Los Altos, California (Wells Fargo property). Decedent and her husband had been jointly engaged in the business of developing, managing, and leasing real estate, and these properties were purchased in furtherance of that business. Each of the properties is discussed in detail below.

Kmart Property

In 1980, decedent and her husband purchased the land and improvements on the Kmart property. The 1,203,000-square-foot site included a 464,818-square-foot, single-story warehouse, with an office, a cafeteria, and a lounge, built in 1971. The building was in good condition. In 1977, decedent and her husband agreed to lease the property to Kmart Corp. for 20 years, commencing on May 1, 1977. The lease rate was $1.19 per square foot with no rent escalation clause in the lease. At the valuation date, the market lease rate was $2 per square foot, making the Kmart rental rate 40 percent below market. There was an option to extend the lease for another 10 years and three more

successive options, each for 5 years, with no rent escalation. The lease was a triple-net lease, which meant there was no cost to the owners of the property because Kmart paid all of the operating costs of the building.

In 1991, Kmart wished to purchase the parking lot adjacent to the Kmart property. The owners of the property refused to sell the lot without the permission of the owners of the Kmart property; namely, decedent and the Trust. The lease was amended, granting consent to the purchase and extending the lease term by 10 years. This resulted in a lease extension to the year 2007 at the same rental rate, leaving 14 years of the lease remaining at the time of decedent's death. The lease amendment also provided another option to extend for an additional 10 years after the end of the three successive 5-year extension options. The rental rate for that second 10-year option was to be 90 percent of the market rate at that time.

Within a few months of decedent's death in 1993, petitioner engaged an appraisal company, Realty Consultants USA, Inc., to perform an appraisal of the Kmart property (Realty appraisal or estate appraisal). That appraisal was used to report the value of the property for estate tax return purposes and for the modification of the mortgage, which modification was completed in 1994. Decedent's estate tax return valued the Kmart property in its entirety at $5,300,000. The mortgage modification triggered

a $60,000 prepayment penalty and created a new "lock-in" provision that prevented the newly modified loan from being paid off in the first 5 years. At the time of the modification, the property owners had no indication that the Kmart lease would not continue for the remaining 14 years.

In June 1996, a real estate broker informed the owners that Kmart wanted to move out of the property and attempt to sublease it. In November 1996, the Kmart owners signed an agreement to sell the entire Kmart property, including the adjacent parking lot, to Security Capital Industrial Trust (Security Capital) for $8,250,000. A few weeks later, Kmart agreed to sell the adjacent parking lot to the Kmart property owners for $350,000. On the same day, the Kmart property owners terminated the Kmart lease, paying a $150,000 lease termination fee to Kmart Corp. The sale of the Kmart property to Security Capital was completed in January 1997.

Walgreen Property

Decedent and her husband purchased the Walgreen property in 1968. The Walgreen property is a 57,106-square-foot site, with a 25,560-square-foot, single-story, commercial building on it, built in 1972. The building was in average condition at the time of decedent's death. The building fronts a heavily traveled arterial street and is located in a commercial/retail complex in

San Bruno, California, which is approximately 8 miles from San Francisco.

In 1992, decedent and the Trust agreed to a 35-year lease to Walgreen Co., a pharmacy/retail business, to commence in 1993. At the time of decedent's death, there were approximately 34 years remaining on the lease.

The parties agree that the fair market value of a 100-percent interest in the Walgreen property was $2,670,000 as of the valuation date.

Wells Fargo Property

Decedent and her husband owned the Wells Fargo property at least since 1977. The Wells Fargo property is a 14,400-square-foot site, with an 8,051-square-foot, single-story, commercial building on it, built in 1978. The building was in very good condition at the time of decedent's death. The property is located in a commercial/retail complex and fronts a heavily traveled arterial street in the city of Los Altos. Los Altos is approximately 30 miles from San Francisco.

In 1977, decedent and her husband agreed to a 25-year lease to Wells Fargo, a retail banking operation, to commence in 1978. At the time of decedent's death, approximately 10 years remained on the lease. The lease was a triple-net lease, meaning that the property owners bore none of the operating costs.

The parties agree that the fair market value of a 100-percent interest in the Wells Fargo property was $987,950 on the valuation date.

OPINION

For Federal estate tax purposes, property includable in the gross estate is generally included at its fair market value on the date of decedent's death.  See secs. 2031(a) and 2032(a); sec. 20.2031-1(b), Estate Tax Regs.[1]  Fair market value is defined as the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under a compulsion to buy or to sell.  See sec. 20.2031-1(b), Estate Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973); Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996).  The willing buyer and the willing seller are hypothetical persons, instead of specific individuals and entities, and the characteristics of these imaginary persons are not necessarily the same as the personal characteristics of the actual seller or a particular buyer.  See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981).  Fair market value is a factual determination for

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

which the trier of fact must weigh all relevant evidence and draw appropriate inferences and conclusions. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944).

Real estate valuation is a question of fact to be resolved on the basis of the entire record. See Ahmanson Found. v. United States, 674 F.2d 761, 769 (9th Cir. 1981); Estate of Fawcett v. Commissioner, 64 T.C. 889, 898 (1975). After determining the gross value of the property, there may be adjustments upward or downward for such factors affecting value as minority discounts, discounts for lack of marketability, control premiums, and fractional interest discounts. See Estate of Andrews v. Commissioner, 79 T.C. 938, 953-956 (1982) (minority discount); Estate of Piper v. Commissioner, 72 T.C. 1062, 1084-1086 (1979) (discount for lack of marketability for stock); Estate of O'Keeffe v. Commissioner, T.C. Memo. 1992-210 (blockage discounts for works of art); Estate of Salsbury v. Commissioner, T.C. Memo. 1975-333 (control premiums).

Valuation is an inexact process. See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). As the trier of fact, we may use experts to assist in deciding upon a value, but we are not bound by those experts' views or opinions. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). One expert may be persuasive on a

particular element of valuation, and another expert may be persuasive on another element.  See <u>Parker v. Commissioner</u>, 86 T.C. 547, 562 (1986).  Consequently, we may adopt some and reject other portions of expert reports or views.  See <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282 (1938).

There are generally three kinds of valuation methods used to determine fair market value of real property:  (1) The comparable sales method, (2) the income method, and (3) the cost method. See <u>Marine v. Commissioner</u>, 92 T.C. 958, 983 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991).

<u>Property Valuation</u>

Petitioner is attempting to show that the fair market value of the Kmart property is $5,300,000, the same amount that was used to compute the value reported on the Estate's tax return. Petitioner's primary trial expert reviewed the appraisal used in connection with the estate tax return.  He relied heavily on the two income approach methods of valuation and calculated a $5,300,000 fair market value for the Kmart property. Respondent's expert used one of the income approach methods and the comparable sales approach.  His approaches resulted in fair market values ranging from $5,700,000 to $6 million.  Finally, petitioner's rebuttal expert reviewed respondent's expert's report and concluded that the fair market value was just over $5,400,000.

The estate appraisal used the cost approach, the market approach, and two of the income approach methods, the direct capitalization method and the discounted cash-flow method. Norman C. Hulberg, petitioner's primary expert, opined that the estate appraisal was sound. His report mainly focused on the two income approaches.

The direct capitalization approach is based on estimates of potential gross income that might be expected from the rental of real estate and any possible losses and/or expenses that might be incurred by the owner/lessor. In the direct capitalization approach, the estate appraiser converted 1 year's projected rental income into a value by dividing adjusted income by an income capitalization rate. The capitalization rate, which is market derived, represents the relationship between net operating income and value.

Using comparable leased properties with rental rates between $1.72 and $3.25 per square foot, the estate appraiser opined that like property would rent for approximately $2 per square foot. The rental rate was affected by the fact that the market for older properties, such as the Kmart property, was relatively soft at that time due to the availability of newer properties in the area. The actual rental rate in the Kmart lease was $1.19 per square foot. The holding period for this type of property is usually 10 to 15 years, although the actual holding period of

this leased interest was 20 years, with a 10-year option that had been exercised and three 5-year options remaining. One real estate investors' survey, the Peter F. Korpacz National Investor Survey, Third Quarter 1993, reported that the average going-in capitalization rate on industrial properties such as this was 9.55 percent. The CB Commercial National Investor Survey for the 2d Quarter 1993 in the "Warehouse/Distribution" category, reported a going-in capitalization rate of 9.8 percent. Because the property had a highly credit-worthy tenant with a long-term lease, Hulberg increased the rate slightly to 10 percent. The estimated net operating income (NOI) of the subject property was then divided by this rate. Because the property owners bear no costs beyond their management, the $1.19 rental rate was reduced to $1.17 per square foot to reflect the management fee, resulting in an NOI of $542,081. The resulting property valuation would be $5,420,810.

The second element of petitioner's income approach valuation is a discounted cash-flow analysis. Under this approach, the value of the property is equal to the present value of the future cash. The owner also possesses a reversionary interest at the end of the holding period. The rate used to discount the projected cash-flows and eventual reversionary interest takes into consideration the inherent risks of real estate ownership and competitive alternative investments. The estate appraiser

used an 11-percent discount rate, based on the national investor survey averages along with a 3-percent property reversion rate. Applied to the NOI, the resulting value under the discounted cash-flow method is $5,100,000.

The appraiser then compared the two values and, giving somewhat heavier weight to the direct capitalization method due to the relatively flat income stream, reached a $5,300,000 value.

As further support for the estate appraisal value, Hulberg calculated the cash-flow of the Kmart lease through 2022. The present value, using a 10-percent discount with a 2-percent management fee expense, resulted in a value of $5,106,000. Hulberg then calculated the reversion value of the property at the 2022 projected end of the lease. Assuming that the 51-year old building would have a terminating useful life, Hulberg used the 1993 appraisal value, appreciated the property using a 2-percent inflation factor, and deducted demolition costs (at $2 per square foot) and sales expenses, yielding a net land value of $1,678,000. Finally, using a 10-percent present value discount rate, the land value would be $106,000, which when added to the cash-flow figure results in a proposed $5,212,000 value.

Respondent's expert, John A. Thomson, used the discounted cash-flow method (income approach) coupled with a comparable sales approach. To determine the appropriate discount rate for the discounted cash-flow method, Thomson did not look to rates of

return from similar rental real estate, as Realty and Hulberg did. Instead, Thomson looked at alternative investment rates for investments of a certain level of risk. Relying on Kmart's creditworthiness, he determined that long-term debt instruments of Kmart are ranked by Moody's Corporate Bond ratings in the various "A" classifications. "A" corporate bonds had a rate of 7.05 percent in September 1993, while "Baa" corporate bonds had a 7.34-percent rate. Adjusting for an existing 40-percent below-market lease contract rate and the illiquidity of the leased property, Thomson derived a 9-percent discount rate to apply to rents through 2022. The lease rate increases to 90 percent of market in 2023 through 2032, but because of the additional risk of no longer having a significant rent advantage and having an older building, Thomson increased the rate to 12 percent. These discount figures result in a present value of the cash-flow of $5,936,335.34.

Then assuming the building will have a $71,910.40 residual economic value beyond 2032, Thomson added this to the cash-flow value reaching a $6,008,245.34 value for the Kmart property.

Thomson also used a comparable sales approach to value the Kmart property. He used three of the four properties that the estate appraiser had used and arrived at the same undiscounted value of $9 million before discounting for the below-market lease rate on the property. Thomson and the estate appraiser used the

$2-per-square-foot market rental rate and calculated an annual rent loss of $376,502.58. The estate appraiser had used a 10-percent discount rate, equal to the discount rate used in its direct capitalization method and 1 percentage point lower than the rate used in the discounted cash-flow method. Thomson, on the other hand, discounted the rental loss at 11 percent, 2 percentage points above his discount rate on the income stream and increased it to 14 percent for the portion of the lease between 2023 and 2032. This resulted in a value of $5,700,000.

Petitioner's second expert, Morgan W. White (White), presented a rebuttal of Thomson's report/opinion. While White acknowledged that direct capitalization was an accepted methodology for valuing investment property, he chose not to use it in this situation due to the type and length of lease, specifically a long-term, flat-rate lease. Instead, White followed Thomson's method and evaluated the property using the discounted cash-flow method.

White criticized Thomson's choice of discount rates because of the heavy reliance on the lessee's high credit rating and failure to recognize the long-term illiquidity and end-value uncertainty. Instead, White concluded that the discount rate for this type of investment calls for a premium to compensate the lessor. He used a 3-percent premium for the first portion of the lease. Using Thomson's "Baa" bond rate of 7.34 percent as

representative of what Kmart's 29-year bonds would trade at in the open market, the addition of the premium would result in a rate of 10.34 percent. Then, as Thompson had, White applied a higher rate to the second portion of the lease, extending from 2023 to 2032. He chose a 13-percent rate to reflect the high uncertainty surrounding the financial viability of the property so far into the future, the difficulty of re-leasing a large, aging facility for any brief remainder of its life and the high likelihood of having to make significant capital improvements in order to do so. While saying that he thought that, in all likelihood, only the land would have any value and that significant costs would be attached to necessary capital improvement at the lease's end, White accepted Thomson's residual value of $71,901 to be "as good a guess as anyone's". White calculated a gross value of $5,408,784 for the Kmart property.

Although the 1997 sale reflects the value of the property at that time, it is not close enough in time, and it depended on information that was unknown and unforeseeable at the time of decedent's death. The termination of the Kmart lease, inclusion of the parking lot property, and penalties for early loan payoff were all factors that were not under consideration on September 7, 1993. We cannot consider unforeseeable future events that may affect the value of property at a later date. See sec. 20.2031-1(b), Estate Tax Regs.; see also Estate of Newhouse v.

<u>Commissioner</u>, 94 T.C. 193, 218 (1990); <u>Estate of Gilford v.</u>
<u>Commissioner</u>, 88 T.C. 38, 52 (1987).  The owners decided to
refinance the property in 1994, even though a penalty was due and
a strict prepayment restriction was added to the modified
mortgage.  This would indicate that there was no intention on the
owners' part to sell at any time soon after the modification was
completed.  For this reason, we do not consider the 1997 sale
price.

Both parties used acceptable methodologies for valuing the
subject property.  Although the methodologies were appropriate,
we do not agree in all respects with the manner in which they
were applied.  With respect to the Kmart property valuations, we
tend to favor petitioner's applications.  The use of the bond
return by respondent's expert is less reflective of the below-
market return to be expected from the lease.  Comparable real
estate investment returns are more appropriate here.  In
addition, we disagree with Thomson's manipulation of the rates to
cause a higher discount rate for the rental loss.  Thomson's
approach resulted in a higher value favoring respondent but was
without explanation for differing discounts for simultaneous
monetary events.

Moreover, Thomson did not explain his reasons for concluding
that the life of warehouse would exceed 60 years and therefore
have a residual value at the end of the Kmart lease.  We accept

petitioner's data that indicates that warehouses in good or excellent condition, as the Kmart property is, are estimated to have economic lives of approximately 50 years. Assuming a 45- to 50-year life for the Kmart improvements, Thomson was overly optimistic to conclude that the building would have useful life value. We also accept petitioner's data that indicate that demolition costs average $2 per square foot. Using Thomson's estimated values of $6 million and $5,700,000, then deducting the costs of demolition at $2 per square foot, the result would be lower than petitioner's claimed value of $5,300,000.

Petitioner, on the other hand, presented evidence of generally consistent values for the property, using four different methods. The comparable sales approach used in the Realty appraisal and approved of by Hulberg, yielded a value of $5,200,000. The income approach methods yielded values of approximately $5,420,000 and $5,100,000. As a further cross-check, Hulberg calculated the present cash-flow of the Kmart lease through 2022, using a 3-percent reversion rate for the land, a 10-percent discount rate for the income stream and the net land value, and deductions for the demolition costs and sales expense, resulting in a fair market value of $5,212,000 for the property. Throughout all of these different valuation methods, petitioner's experts consistently used discount rates within 1 percentage point of each other. Discount rates between 10

percent and 11 percent, such as those that petitioner's experts used, are supported by the national real estate investors' surveys at the time of decedent's death. Furthermore, petitioner's experts did not attempt to manipulate rates to produce inconsistent, yet favorable, discounts on income and loss from the same period within a single valuation method. For these reasons, we sustain petitioner's reported fair market value and hold that the value of the Kmart property at the date of decedent's death was $5,300,000.

Discounts

Discounts to the fair market value of property may be appropriate to reflect a lack of control and/or a lack of marketability. A lack of control is the inability to change corporate or business attributes. See Estate of Casey v. Commissioner, T.C. Memo. 1996-156. The owners here are all family members, but it cannot be assumed that a family will always act as a unit in matters regarding the property. See Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249, 1253 (7th Cir. 1988). Generally, there is no ready market for a partial interest in a closely held property and that lack of marketability causes a reduced liquidity. See Estate of Casey v. Commissioner, supra. The need for employing a discount is dependent on whether a decedent's partial interest would affect the marketability of a property. See Propstra v. United States,

680 F.2d 1248 (9th Cir. 1982). Petitioner bears the burden of showing that a discount is appropriate and the amount of any discount. See Rule 142(a); <u>Estate of Van Horne v. Commissioner</u>, 78 T.C. 728 (1982), affd. 720 F.2d 1114 (9th Cir. 1983).

The parties provided experts' opinions regarding the appropriate discounts for the three properties. Petitioner's primary expert used a variety of methods, including a survey of companies purchasing and selling partnership interests, a 10-factor fractional interest analysis, and a comparable sales approach. The three methods resulted in similar discount amounts, ranging between 29 percent and 35 percent. Petitioner's expert concluded that the appropriate discounts were as follows: Kmart property--35 percent, Walgreen property--30 percent, and Wells Fargo property--35 percent. Petitioner's rebuttal expert reviewed respondent's expert report on the Kmart property and opined that the discount for that property should be 35.4 percent. Respondent's expert looked only at the cost to partition the properties, then increased the amount of the discounts for unspecified costs. His report opined that the discounts should be as follows: Kmart property--10 percent, Walgreen property--10 percent, and Wells Fargo property--20 percent.

Accordingly, respondent, through his expert, agrees that some discount is appropriate. Thomson calculated the partition

costs of the three properties to be between $30,000 and $40,000 if no trial were necessary and between $90,000 and $120,000 if a trial were necessary. He estimated these costs to be 3 to 4 percent of his estimated value of a one-half interest in the Kmart property. Without a clear explanation of the increase, Thomson increased his estimation of the partition cost discount to 10 percent for the Kmart property, rounding up to an estimated partitioning cost of $300,000. He applies the same 10-percent discount to the Walgreen property interest, rounding up to an estimated partitioning cost of $135,000, and explains the difference in partitioning costs of the Kmart property and the Walgreen property by stating that partitioning costs increase with the size of the property. He increased the discount amount of the Wells Fargo property to 20 percent, reasoning that the discount is increased due to the cost of partitioning relative to the lesser value of the Wells Fargo property.

Thomson concluded that the need to discount for control or marketability is minimized because partitioning would cure any control problem. He does include, but does not apply, information on limited partnership discounts at the time of the valuation date. The range of the rates is between a premium of 8.33 percent (-8.33 percent) to discount of 50.52, with a median of 12.71 percent and a mean of 13.56 percent.

Petitioner challenges respondent's partition cost approach. Petitioner contends that the three properties could not be partitioned, claiming that decedent and her husband, later represented by the Trust, waived any right to partition the properties held jointly by reason of oral and written contracts. If no partition is available, petitioner maintains that Thomson's discount methodology based on partitioning costs is pertinent only as one of the factors of the loss of control discount.

Petitioner's argument must fail because the Trust and decedent's trust each provide the trustee with the power to partition the property. The importance of partitioning costs is dependent on the circumstances of each case. Partition is a more viable approach where real property is unimproved. Where significant income-producing improvements are involved, partition is a less plausible approach. Respondent's use of partition cost alone does not give adequate weight to other reasons for discounting a fractional interest in this case such as the significance of the control factor and the historic difficulty of selling an undivided fractional interest in improved real property. See Williams v. Commissioner, T.C. Memo. 1998-59.

Petitioner contends that the discount applied to decedent's 50-percent interests should be greater than just the cost to partition. Hulberg, petitioner's primary expert, estimated the

discount on the Kmart property to be 35 percent,[2] the Walgreen property discount to be 30 percent,[3] and the Wells Fargo property to be 35 percent.[4]  Hulberg based his discounts on several factors.  First, he emphasized the fact that neither owner of the property had control.  He pointed out that any potential buyer of decedent's property interest would consider the lack of control, the risk in terms of cost to partition, delay of partition, lack of liquidity of the real property, lack of marketability for resale, and the inability to finance without consent of the other owner.

Hulberg used three different approaches to determine the proper discount.  The first was the "Company Survey Method", which was described as a "survey of companies in the business of purchasing and selling partnerships."  This method is less relevant because the properties are closely held family-owned entities and less marketable than diversely held entities.  Hulberg uses this method due to the limited number of comparable sales of fractional interests in real estate and suggests that there is a close analogy between fractional real property

---

[2] This reflects a 15-percent discount for lack of control and 20 percent for lack of marketability.

[3] This reflects a 15-percent discount for lack of control and 15 percent for lack of marketability.

[4] This reflects a 15-percent discount for lack of control and 20 percent for lack of marketability.

interests held as tenants in common and real property partnership interests.  The information he received from one company marketing public and private partial interests was that those interests are typically discounted between 35 and 70 percent, depending on certain factors.  Another company marketing only privately held interests reported a tighter range of 42-percent to 49-percent discounts for privately held, family-oriented general partnership interests.  A third source of data for real estate partnerships reported that during 1993, the average discount for such an interest in the triple-net lease category was 20 percent.

Hulberg found the indicated discount range for a triple-net lease property with a 47-percent loan-to-value ratio, such as the Kmart property, using these comparison figures, was between 20 to 51 percent.  He estimated the proper discount to be 35 percent due to the flat rate of income on the Kmart property.  He found that partnership interests with similar characteristics to the Walgreen property had an average discount of 20 percent, which he adjusted for control and marketability, arriving at a discount of 30 percent.  The 35-percent Wells Fargo property discount was based on the same 20-percent figure, adjusted for the lack of investment appeal for an older building and for marketability and control.

The second method Hulberg used was the "Fractional Discount Method". The method was set out in an April 1992 journal article, Davidson, "Fractional Interests in Real Estate Limited Partnerships", The Appraisal Journal, 184-194 (Apr. 1992), in which 10 factors were used to analyze the amount of a fractional interest and a partnership discount. The factors included: Relative risk of assets held, historical consistency of distributions, conditions of assets, market's growth potential, portfolio diversification, strength of management, magnitude of the fractional interest, liquidity of the interest, ability to influence management, and ease of asset analysis. Using those factors, Hulberg arrived at a 35-percent discount for Kmart property, a 33-percent discount for the Walgreen property, and a 34-percent discount for the Wells Fargo property. However, the factors are applicable to going real estate limited partnership interests and are not fully applicable to the present situation due to the family ownership, the lack of diversity of assets, and the lack of a professional management company. The applicable factors would appear to be risk of assets held, historical consistency of distributions (i.e., rental income history), conditions of assets, the magnitude and liquidity of the interest, and management influence. The total discount attributable to these factors ranges from 25 percent to 27 percent.

The third method used by Hulberg was the Comparable Sales. He found two sales which he believed were comparable. The first was a 50-percent undivided interest in a $2 million, multitenant office building. The fractional interest discount was 35 percent. The second comparable was a 50-percent general partnership interest in a family property worth $3,390,000. The discount was 29 percent.

Petitioner's second expert, White, agrees with Hulberg that partnership discounts are relevant to the facts at hand because they represent diversified pools of leases on multiple buildings to different tenants, thus reducing the risk of a single obligation by a single tenant at one location. Also a partnership unit is more valuable than an undivided private interest because a negotiated, secondary market exists for the former. White reasons that the median discount in the traded market for a multilease, private partnership interest should be doubled due to these factors. He arrives at a 25.4-percent discount. He then adds an additional 10-percent discount to compensate for the highly valued professional management available for partnership units that is not available on decedent's properties.

Considering the parties' experts' reports and opinions, we find that the appropriate discount amount should be neither as low nor as high as those suggested. We find that a 25-percent

discount is appropriate for all three of the properties.  This figure is supported by the factor analysis for fractional interests, which gave us a figure between 25 percent and 27 percent.  We do not limit the discount to the costs of partitioning because such a discount does not account for the factors of control and marketability in the circumstances of this case.  An interest in income-producing, improved real property without control and in a closely held family property may be difficult to sell.  But, on the positive side, the properties are in average to very good condition, with remaining economic lives.  They all had good rental histories with creditworthy tenants and are well located.

In summary, we hold that the fair market value of the Kmart property was $5,300,000 as of the date of decedent's death and decedent's 50-percent undivided interest had a value of $1,987,500 after a 25-percent marketability discount.  The 50-percent undivided interest in the Walgreen property had a fair market value of $1,335,000 before a 25-percent discount, resulting in a returnable value of $1,001,250.  Finally, the 50-percent undivided interest in the Wells Fargo property had a fair market value of $493,975 before a 25-percent discount, resulting in a returnable value of $370,481.

To reflect the foregoing,

Decision will be entered

under Rule 155.