T.C. Memo. 2003-280

UNITED STATES TAX COURT

PETER S. PERACCHIO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10470-01.                    Filed September 25, 2003.

P transferred limited partner interests in a
family limited partnership (PT) to a family trust (T)
pursuant to two separate transactions.  In one of the
transactions, P transferred a 45.47-percent limited
partner interest to T for no consideration.  In the
other transaction, P transferred a 53.48-percent
limited partner interest to T in exchange for T's
promissory note in the amount of $646,764.

<u>Held</u>:  Fair market value of the transferred PT
interests determined.  See sec. 2512, I.R.C.

<u>Eric M. Nemeth</u>, <u>Michael J. Mulcahy</u>, and <u>Brian C.
Bernhardt</u>, for petitioner.

<u>John W. Stevens</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency dated May 25, 2001 (the notice of deficiency), respondent determined a deficiency in Federal gift tax for calendar year 1997 with respect to petitioner in the amount of $328,317.  Petitioner timely filed a petition for redetermination.  The dispute involves the value of interests in a family limited partnership transferred by petitioner to a family trust.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect on the date of the transfers, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.

## FINDINGS OF FACT

Some facts are stipulated and are so found.  The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.  At the time he filed the petition, petitioner resided in Grosse Pointe Woods, Michigan.

Formation of the Trust and the Partnership

On November 25, 1997 (the valuation date), petitioner, as settlor, and petitioner's wife, as trustee, executed a trust agreement creating the Peracchio Family Trust (the trust).  On the same day, petitioner, the trust, and petitioner's son, John R. Peracchio, executed an agreement of limited partnership (the partnership agreement) with respect to Peracchio Investors, L.P.,

a Delaware limited partnership (the partnership). Petitioner contributed cash and securities with a designated value of $2,013,765 to the partnership in exchange for a 0.5-percent general partner interest and a 99.4-percent limited partner interest in the partnership, which, collectively, represented 2,013.765 partnership units. Petitioner's son contributed $1,000 to the partnership in exchange for a 0.05-percent general partner interest in the partnership, which represented one partnership unit. The trust contributed $1,000 to the partnership in exchange for a 0.05-percent limited partner interest in the partnership, which also represented one partnership unit.

Transfers of Partnership Units

Also on the valuation date, petitioner made three transfers of partnership units. Petitioner gratuitously transferred 9.0788 partnership units (representing 0.45 percent of all partnership units outstanding) to his son, to be held in the capacity of a general partner. Petitioner also gratuitously transferred 916.667 partnership units (representing 45.47 percent of all partnership units outstanding) to the trust, to be held in the capacity of a limited partner. Petitioner transferred an additional 1,077.9409 partnership units (representing 53.48 percent of all partnership units outstanding) to the trust, to be held in the capacity of a limited partner, in exchange for the trust's promissory note in the amount of $646,764. After the

foregoing transfers, the percentage ownership of the partnership was as follows:

| General Partners | |
|---|---|
| Peter S. Peracchio | 0.05% |
| John R. Peracchio | 0.50% |
| | |
| Limited Partners | |
| Peter S. Peracchio | 0.45% |
| Peracchio Family Trust | 99.00% |
| Total | 100.00% |

## Partnership Assets

The partnership's assets on the valuation date consisted entirely of cash and marketable securities.[1]  The partnership's domestic stock portfolio on that date consisted of shares in 44 companies, with no apparent concentration in any particular industry.

## Relevant Provisions of the Partnership Agreement

Among other things, the partnership agreement provides as follows:

The partnership will continue in existence until November 25, 2047 (the termination date), unless sooner terminated in accordance with the terms of the partnership agreement.  No limited partner may withdraw his capital from the partnership

---

[1]  The partnership held certain marketable securities indirectly through investment funds, including "open-end" investment funds.  We understand from the expert reports received into evidence in this case that, although shares of open-end investment funds are not themselves publicly traded, a holder thereof generally can liquidate his investment at any time by tendering his shares to the fund for repurchase at a price equal to their pro rata share of the fund's net asset value (NAV).

prior to the termination date without the written consent of the general partners.

Partners may freely transfer their partnership units to or for the benefit of certain family members and charitable organizations (permitted transferees). A partner desiring to transfer his partnership units to someone other than a permitted transferee must first offer those units to the partnership on the same terms and conditions. The partnership then has 30 days to exercise its option to purchase such units. Regardless of the identity of the transferee, no transferee of partnership units can attain the legal status of a partner in the partnership without the unanimous consent of all general partners.

Limited partners have no right to participate in the management of the partnership's affairs, and partnership distributions are subject to the discretion of the general partners.

The Gift Tax Return

Petitioner timely filed Form 709, United States Gift (and Generation Skipping Transfer) Tax Return, for 1997 (the Form 709). In a statement attached to the Form 709, petitioner reported his gratuitous transfer of 9.0788 partnership units to his son at a value of $9,070. In the same statement, petitioner reported his gratuitous transfer of 916.667 partnership units to the trust at a value of $550,000. In another attachment to the Form 709, petitioner disclosed that he had determined the value

of his gratuitous transfer to the trust by (1) multiplying the number of partnership units transferred (916.677) by their designated "per unit" value of $1,000, and (2) applying a combined discount of 40 percent (for lack of control and lack of marketability) to the resulting figure.

The Notice of Deficiency

By the notice of deficiency, respondent determined a deficiency in Federal gift tax with respect to petitioner in the amount of $328,317, based primarily on an increase in 1997 taxable gifts in the amount of $797,843.[2]  Specifically, respondent (1) increased the value of petitioner's gratuitous transfer to the trust from $550,000 to $916,667, and (2) determined an additional gift in the amount of $431,176, representing the amount by which, according to respondent, the value of the additional 1,077.9409 partnership units transferred by petitioner to the trust exceeded the consideration received therefor.[3]

Respondent based his determination on four alternative theories:  (1) that the partnership lacks economic substance and

_____

[2]  Respondent also determined that, in preparing the Form 709, petitioner failed to account for $70,500 of taxable gifts made in prior years.  Petitioner does not dispute that determination and has paid the portion of the asserted deficiency (plus interest) attributable thereto.

[3]  Respondent did not adjust the value of petitioner's gratuitous transfer of 9.0788 partnership units to his son.

therefore should be disregarded for Federal gift tax purposes, (2) that the partnership agreement should be treated as a restriction on the right to sell or use property (i.e., the property underlying the transferred partnership units) which must be disregarded under section 2703(a)(2) in determining the Federal gift tax value of such property, (3) that the provision in the partnership agreement restricting a limited partner's ability to liquidate his interest by withdrawing from the partnership should be treated as an applicable restriction under section 2704(b) which must be disregarded in determining the Federal gift tax value of the transferred partnership units, and (4) that in determining the fair market value of the transferred partnership units under the general valuation rule of section 2512, no discounts for lack of control and lack of marketability are warranted. Respondent has since abandoned the first three of those four alternative theories and has modified his position with respect to the remaining theory to allow for a 4.4-percent discount for lack of control and a 15-percent discount for lack of marketability.

OPINION

I. Introduction

We must determine the fair market value, as of the date of transfer, of 45.47-percent and 53.48-percent limited partner

interests (the gifted interest and the sold interest,[4] respectively, and, collectively, the transferred interests) in Peracchio Investors, L.P. (the partnership) transferred by petitioner to the Peracchio Family Trust (the trust) in separate transactions occurring on November 25, 1997 (the valuation date). The parties agree that, because the partnership's assets on the valuation date consisted entirely of cash and marketable securities, the partnership's net asset value (NAV) on that date is the appropriate starting point for determining the fair market value of the transferred interests. The parties further agree that, in valuing the transferred interests, it is appropriate to discount each interest's pro rata share of the partnership's NAV to reflect the lack of control and lack of marketability inherent in the transferred interests. The parties disagree on the magnitude of those discounts. For purposes of reporting the value of the gifted interest on his Federal gift tax return and establishing the consideration for the sold interest, petitioner applied a combined discount of 40 percent. Respondent contends that 4.4-percent and 15-percent discounts for lack of control and lack of marketability, respectively, are appropriate, yielding a combined discount (applying the separate discounts serially) of 18.74 percent.

---

[4] We use the term "sold interest" solely for descriptive convenience (i.e., without regard to the proper characterization, for Federal gift tax purposes, of petitioner's transfer of that interest).

Petitioner bears the burden of proof.[5]  Rule 142(a)(1).

II.  Law

Section 2501(a) imposes a tax on the transfer of property by gift.  Section 2512(a) provides that, if a gift is made in property, the value of the property on the date of the gift is considered the amount of the gift.  Section 25.2512-1, Gift Tax Regs., provides that the value of property for Federal gift tax purposes is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts."  The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the donor and the donee.  Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Bright v.

---

[5]  Petitioner does not raise the applicability of sec. 7491(a), which operates to shift the burden of proof to the Commissioner in certain circumstances.  See Rule 142(a)(2). However, petitioner argues for the first time in his posttrial reply brief that, under general principles of Federal tax law, respondent bears the burden of proof on the ground that the notice of deficiency is arbitrarily excessive and without foundation.  As petitioner did not timely raise that issue, we decline to consider it.  See, e.g., Graham v. Commissioner, 79 T.C. 415, 423 (1982) ("It is well settled that this Court will not consider issues raised for the first time on brief when to do so prevents the opposing party from presenting evidence or arguments that might have been presented if the issue had been timely raised.").

United States, 658 F.2d 999, 1006 (5th Cir. 1981)).[6]  The
hypothetical willing buyer and willing seller are presumed to be
dedicated to achieving the maximum economic advantage.  Estate of
Newhouse, supra at 218.

III.  Expert Opinions

    A.  Introduction

    In this case, the parties rely exclusively on expert
testimony to establish the appropriate discounts to be applied in
determining the fair market value of the transferred interests.
Of course, we are not bound by the opinion of any expert witness,
and we may accept or reject expert testimony in the exercise of
our sound judgment.  Helvering v. Natl. Grocery Co., 304 U.S.
282, 295 (1938); Estate of Newhouse v. Commissioner, supra at
217.  Although we may largely accept the opinion of one party's
expert over that of the other party's expert, see Buffalo Tool &
Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980),
we may be selective in determining what portions of each expert's
opinion, if any, to accept, Parker v. Commissioner, 86 T.C. 547,
562 (1986).  Finally, because valuation necessarily involves an
approximation, the figure at which we arrive need not be directly
traceable to specific testimony if it is within the range of

---

    [6]  Although the cited cases involved the Federal estate tax,
it is well settled that the Federal estate tax and the Federal
gift tax, being in pari materia, should be construed together.
See, e.g., Shepherd v. Commissioner, 283 F.3d 1258, 1262 n.7
(11th Cir. 2002) (citing Harris v. Commissioner, 340 U.S. 106,
107 (1950)), affg. 115 T.C. 376 (2000).

values that may be properly derived from consideration of all the evidence. Estate of True v. Commissioner, T.C. Memo. 2001-167 (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285).

B. Petitioner's Experts

Petitioner offered Timothy R. Dankoff and Charles H. Stryker as expert witnesses to testify concerning the value of the transferred interests. Mr. Dankoff is a partner in Plante & Moran, LLP, an accounting and management consulting firm. He is accredited as a senior appraiser by the American Society of Appraisers and has been involved in business valuation activities since 1986. Mr. Stryker is a partner in the valuation and appraisal group of BDO Seidman, LLP, an accounting and consulting firm. He has been performing valuation services for approximately 25 years. The Court accepted Mr. Dankoff and Mr. Stryker as experts in valuation and received into evidence as their expert testimony their respective written analyses regarding the value of the transferred interests.

In his written report, Mr. Dankoff concludes that, based on a 7.7-percent minority interest discount and a 35-percent marketability discount, the fair market values of the gifted interest and the sold interest on November 30, 1997 (5 days after the valuation date), were $550,000 and $646,764, respectively. Mr. Stryker concludes in his written report that, based on a 5-

percent minority interest discount and a 40-percent marketability discount, the fair market value of the gifted interest on the valuation date was $522,609. Mr. Stryker did not separately calculate the fair market value of the sold interest.

C. Respondent's Expert

Respondent offered Francis X. Burns as an expert witness to testify concerning the value of the transferred interests. Mr. Burns is managing director of InteCap, Inc., a financial consulting firm that specializes in valuation services. He has been performing valuation services for approximately 15 years and has testified as an expert in several valuation cases. The Court accepted Mr. Burns as an expert in valuation and received into evidence as his expert testimony his written analysis regarding the value of the transferred interests.

In his written report, Mr. Burns concludes that, based on a 4.4-percent minority interest discount and a 15-percent marketability discount, the fair market values of the gifted interest and the sold interest on the valuation date were $742,071 and $872,794, respectively.

IV. Discussion

A. Net Asset Value of the Partnership

Mr. Dankoff's firm valued the assets petitioner contributed to the partnership (the contributed assets) at $2,013,765. In his written report, Mr. Dankoff acknowledges that such figure

(upon which petitioner's other expert, Mr. Stryker, relied as well)[7] is based on values reported in brokerage account statements as of November 30, 1997 (5 days after the valuation date). Respondent's expert, Mr. Burns, concludes in his written report that the value of the contributed assets on the valuation date was $2,008,370.[8] We accept Mr. Burns's conclusion in that regard.[9] Taking into account the $2,000 in cash contributed by the other partners of the partnership, we conclude that the partnership's NAV on the valuation date was $2,010,370.

B. Minority Interest (Lack of Control) Discount

1. Introduction

Pursuant to the partnership agreement, a hypothetical buyer of all or any portion of the transferred interests would have limited control of his investment. For instance, such holder (1) would have no say in the partnership's investment strategy, and (2) could not unilaterally recoup his investment by forcing the partnership either to redeem his interest or to undergo a complete liquidation. The parties agree that the hypothetical

---

[7] Mr. Stryker also inappropriately added approximately $640 of interest earned by the partnership in December 1997.

[8] Mr. Burns actually identifies that figure as the partnership's NAV. In doing so, he overlooks the $2,000 contributed by the other partners, which the parties have stipulated.

[9] Although the parties stipulated that, for purposes of the notice of deficiency, respondent relied on the valuation of the contributed assets by Mr. Dankoff's firm, the parties did not stipulate the accuracy of that figure.

"willing buyer" of a transferred interest would account for such lack of control by demanding a reduced sales price; i.e., a price that is less than the interest's pro rata share of the partnership's NAV.

     2.  <u>Comparison to Closed End Investment Funds</u>

     a.  <u>Overview</u>

Each expert witness determined a minority interest discount for the transferred interests by reference to shares of publicly traded, closed end investment funds, which typically trade at a discount relative to their share of fund NAV.[10] The idea is that, since such shares (by definition) enjoy a high degree of marketability, those discounts must be attributable, at least to some extent, to a minority shareholder's lack of control over the investment fund.[11]

---

[10] We understand from the expert reports received into evidence in this case that, unlike a shareholder of an open-end fund (and similar to a holder of a limited partner interest in the partnership), a shareholder of a closed end fund cannot obtain the liquidation value of his investment (i.e., his pro rata share of the fund's NAV) at will by tendering his shares to the fund for repurchase.

[11] That there are other factors involved in the pricing of closed end fund shares is evidenced by the fact that shares of some funds trade at a <u>premium</u> relative to their share of fund NAV. In his written report, Mr. Burns suggests that positive pricing factors include heightened investor interest in the specific attributes of a fund, while additional negative pricing factors (i.e., in addition to lack of control) include fund management fees and administration fees. Absent any further refinement of the data contained in the record, we assume that, within each sample of closed end funds we consider in our analysis, such positive factors and additional negative factors

(continued...)

Both Mr. Dankoff and Mr. Burns determine a minority interest discount factor for each type of investment held by the partnership, based (to the extent possible) on discounts observed in shares of closed end funds holding similar assets.[12]  They then determine their respective minority interest discounts for the transferred interests by calculating the weighted average of such factors, based on the partnership's relative holdings of each asset type.  That is an approach we have previously followed in the context of investment partnerships, see McCord v. Commissioner, 120 T.C. 358, 376-387 (2003), and we shall do so again here.

b.  Partnership Asset Categories

Both Mr. Dankoff and Mr. Burns divide the assets of the partnership into five basic categories:  cash and money market funds, U.S. Government bond funds, municipal bonds, domestic equities, and foreign equities.  We utilize those categories in our analysis, except that we divide the "municipal bonds" category into "national" and "Michigan" subcategories.

---

[11](...continued)
roughly offset each other.

[12]  Although petitioner's other expert, Mr. Stryker, purports to derive his minority interest discount from discounts observed in shares of closed end funds, his methodology is comparatively both imprecise (his 5-percent discount is not statistically derived from observed discounts) and incomplete (he considers only domestic equity funds).  For those reasons, we give no weight to that portion of Mr. Stryker's testimony.

c.  Partnership Assets in Each Category

In his written report, Mr. Burns includes a list of partnership investments (and their values as of the valuation date) by asset category.  That list, as modified by the aforementioned refinement of the "municipal bonds" category and two additional classification changes[13] (as well as the addition of $2,000 to the "Cash and Money Market Funds" category to reflect contributions by partners other than petitioner, see supra note 8), yields the following profile of partnership assets as of the valuation date:

| Asset Type | FMV | Percentage |
|---|---|---|
| Cash & money market funds | $883,622 | 44.0 |
| U.S. Government bond funds | 7,988 | 0.4 |
| State & local bonds (MI) | 41,750 | 2.1 |
| Natl. Muni bond funds | 101,145 | 5.0 |
| Domestic equities | 877,179 | 43.6 |
| Foreign equities | 98,686 | 4.9 |
| Total | $2,010,370 | 100.0 |

d.  Date of Price/NAV Data

Both Mr. Dankoff and Mr. Burns obtain their closed end fund data from tables prepared by Lipper Analytical Services (Lipper) and published in Barron's.  However, Mr. Dankoff relies on data as of October 24, 1997, while Mr. Burns utilizes data as of

---

[13]  Because "money market fund" is a term of art, see 17 C.F.R. sec. 270.2a-7(b) and (c) (1997), we have also reclassified "Fidelity MI Muni Money Market" and "Short Term Income Fund-Govt." (listed by Mr. Burns as a municipal bond fund and a U.S. Government bond fund, respectively) as money market funds, which is how they are classified in brokerage statements introduced into evidence.

November 21, 1997.  Absent any explanation from Mr. Dankoff as to why it would be more appropriate for us to use his less contemporaneous data, we utilize Mr. Burns' price and NAV data in our analysis.

      e.   <u>Samples of Closed End Funds</u>

      i.  <u>Cash and Money Market Funds</u>

Both Mr. Dankoff and Mr. Burns implicitly recognize the lack of an appropriate sample of closed end funds from which to derive a minority interest discount factor for the "cash and money market funds" asset category.  In his written report, Mr. Dankoff assigns a 5-percent discount factor to that asset category and notes that such figure is "[j]udgmentally determined recognizing the relative risk/return tradeoff of this asset category vis a vis U.S. Government Bond Funds".  Mr. Burns assigns a 2-percent discount factor to the "cash and money market funds" asset category, noting without further explanation that such figure is an estimate.  While we find neither expert persuasive on this issue, we utilize a 2-percent discount factor in our analysis on the grounds that (1) respondent has effectively conceded that a discount factor of up to 2 percent would be appropriate, and (2) petitioner has failed to carry his burden of persuading us that a figure in excess of 2 percent would be appropriate.

### ii. U.S. Government Bond Funds[14]

Mr. Burns' written report includes a copy of the aforementioned Lipper closed end fund table published in the November 24, 1997, edition of Barron's (the Lipper table). That table lists 13 funds under the heading "U.S. Gov't Bond Funds" and contains NAV data for 12 of those funds.[15] Mr. Dankoff winnows that sample to seven unidentified funds, apparently on the basis of "outliers and asset homogeneity with the subject assets". Mr. Dankoff offers no data in support of his refinement of the sample, and we see no obvious "outliers" in the group. Accordingly, we include in our sample (as did Mr. Burns) all 12 of the funds for which NAV data is set forth in the Lipper table.

### iii. State and Local Bonds (Michigan)

The Lipper table lists five Michigan funds under the heading "Single State Muni Bond". We include in our sample (as did Mr. Dankoff, apparently) all five of those funds.[16]

---

[14] The partnership's lone investment in U.S. Government bonds on the valuation date was itself in the form of shares of a closed end investment fund, Putnam Intermediate Government (PGT). While it may be more appropriate under these circumstances simply to utilize that fund's price-to-NAV discount in our analysis (rather than a discount derived from a sample of funds), the record does not contain that information.

[15] See supra note 14.

[16] Although Mr. Dankoff does not identify the funds included in his sample, he does indicate that his sample contains five funds. Mr. Burns did not create a separate sample of single State funds invested in Michigan-based obligations.

### iv. <u>National Municipal Bond Funds</u>

The Lipper table lists 99 funds under the heading "National Muni Bond Funds" and contains NAV data for 81 of those funds.  As we see no obvious outliers in the data, we include all 81 of those funds in our sample.[17]

### v. <u>Domestic Equities</u>

The Lipper table lists 24 funds under the heading "General Equity Funds" and 21 funds under the heading "Specialized Equity Funds".  Mr. Dankoff apparently included both types of funds in his sample, which is comprised of 44 funds.  Mr. Burns, on the other hand, limited his sample to general equity funds.  As referenced in our findings of fact, the partnership's domestic stock portfolio was widely diversified on the valuation date.  We therefore follow Mr. Burns' lead and limit our sample to general equity funds.  We further limit our sample by excluding two funds from the Lipper table which were trading at unusually high premiums relative to the other domestic equity funds listed in that table.[18]

---

[17]  We cannot deduce from the record whether Mr. Burns included all 81 of those funds in his sample.  However, we note that the average discount of Mr. Burns's sample (3.3 percent) is very close to the average discount of our sample (3.4 percent).

Mr. Dankoff did not create a separate sample of national municipal bond funds.

[18]  Shares of "MFS Special Val" (MFV) and "NAIC Growth" (GRF) were trading at premiums of 27.3 percent and 51.3 percent, respectively.  No other general equity fund listed in the Lipper
(continued...)

        vi.  <u>Foreign Equities</u>

    The Lipper table lists 91 funds under the heading "World Equity Funds" and contains NAV and price data for 89 of those funds.[19]  Unlike Mr. Burns, we exclude from our sample three funds from the Lipper table which were trading at unusually high premiums relative to the other foreign equity funds listed in that table.[20]

        f.  <u>Representative Discount Within the Range of Sample Fund Discounts</u>

    Mr. Dankoff calculates the mean (average) discount and the median (midpoint) discount with respect to each of his fund samples.  In each instance, the median discount is greater than the mean discount.  Mr. Dankoff opts to use the median, rather than the mean, discount with respect to each sample for purposes of determining a minority interest discount factor for each

_____

    [18](...continued)
table was trading at a premium greater than 11.1 percent.

    By contrast, <u>discounts</u> among general equity funds listed in the Lipper table showed less variation, ranging from 2.1 percent to 26.4 percent and averaging 12.8 percent.

    [19]  Mr. Dankoff inexplicably derives his sample from the "World Income Funds" (global bond funds) listed by Lipper.

    [20]  Shares of "Thai Capital" (TC), "Malaysia" (MF), and "Thai" (TTF) were trading at premiums of 35.1 percent, 36 percent, and 55.7 percent, respectively.  No other world equity fund listed in the Lipper table was trading at a premium greater than 21.9 percent.

    By contrast, <u>discounts</u> among world equity funds listed in the Lipper table showed less variation, ranging from 1.6 percent to 31.3 percent and averaging 16.8 percent.

corresponding asset category of the partnership.  At trial, he testified that medians "in my opinion are often more relevant [than means] because it takes outliers out of the equation".  However, Mr. Dankoff's written report suggests that he may have accounted for outliers (by excluding them from his samples) prior to determining sample medians:  "After adjusting for outliers and asset homogeneity with the subject assets, we then calculated a weighted average median discount".  In any event, Mr. Dankoff eventually conceded at trial that "I don't think I have a good reason as to why one was better than the other, and I think either one [median or mean] could have been used."  Because it seems more straightforward to us to account for obvious outliers by excluding them from the samples in question, we utilize the mean discount from each of our samples as the minority interest discount factor for each corresponding asset category of the partnership.

> g.  Minority Interest Discount Factor for Each Asset Category

Based on the methodology described above, we conclude that the appropriate minority interest discount factors for the partnership asset categories are as follows:

| Asset Type | Discount Factor |
|---|---|
| Cash & money market funds | 2.0% |
| U.S. Government bond funds | 6.9% |
| State & local bonds (MI) | 3.5% |
| Natl. Muni bond funds | 3.4% |

Domestic equities                                    9.6%
Foreign equities                                    13.8%

### 3. Determination of the Minority Interest Discount

The minority interest discount factors determined above yield a weighted average discount of 6.02 percent, determined as follows:

| Asset Type | Percent of NAV | Percent Disc. Factor | Percent Weighted Average |
|---|---|---|---|
| Cash & money market funds | 44.0 | 2.0 | 0.88 |
| U.S. Government bond funds | 0.4 | 6.9 | 0.03 |
| State and local bonds (MI) | 2.1 | 3.5 | 0.07 |
| Natl. Muni bond funds | 5.0 | 3.4 | 0.17 |
| Domestic equities | 43.6 | 9.6 | 4.19 |
| Foreign equities | 4.9 | 13.8 | 0.68 |
| Discount | | | 6.02 |

Rounding to the nearest percentage point, we conclude that the appropriate minority interest discount for the transferred interests is 6 percent.

### C. Marketability Discount

#### 1. Introduction

The parties agree that, to reflect the lack of a ready market for the transferred interests, an additional discount should be applied to the partnership's NAV (after applying the minority interest discount) for purposes of determining the fair market value of those interests. Such a discount is commonly referred to as a "marketability discount". The parties disagree on the appropriate magnitude of that discount in the context of the transferred interests.

2. <u>Analyses of Petitioner's Experts</u>

a. <u>General Approach</u>

Both Mr. Dankoff and Mr. Stryker start with a benchmark discount or range of discounts and then determine, based on the factors we analyzed in <u>Mandelbaum v. Commissioner</u>, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996), whether the marketability discount for the transferred interests should be greater than, less than, or equal to (or within) the benchmark discount (or range of discounts).  Because we are unpersuaded by either expert's determination of the appropriate benchmark (starting point), we give little weight to their respective analyses.

b. <u>Mr. Dankoff's Analysis</u>

In his written report, Mr. Dankoff states that, in <u>Mandelbaum v. Commissioner</u>, <u>supra</u>, the Tax Court "established a benchmark lack of marketability discount range of 35% to 45%". He subsequently states that he analyzed the factors we reviewed in <u>Mandelbaum</u> "as they relate to the subject Partnership in order to determine whether the Partnership's lack of marketability discount should be above, below or within the range indicated by the benchmark range of 35% to 45%."  Thus, although Mr. Dankoff refers to numerous empirical studies elsewhere in his report, he derives his quantitative starting point (35 percent to 45 percent) from the <u>Mandelbaum</u> case.

To the extent Mr. Dankoff believes that the benchmark range of discounts we utilized in <u>Mandelbaum v. Commissioner</u>, <u>supra</u>, is controlling in this or any other case, he is mistaken.[21] Nothing in <u>Mandelbaum</u> suggests that we ascertained that range of discounts for any purpose other than the resolution of that case. To the contrary, we specifically stated that we were using the upper and lower limits of that range "as benchmarks of the marketability discount <u>for the shares at hand</u>." (Emphasis added.) If, instead, Mr. Dankoff simply believes that such range of discounts is equally appropriate under the facts of this case, he offers no justification whatsoever for that view. We believe he would be hard pressed to do so; the entity at issue in <u>Mandelbaum</u>, an established operating company, bears little resemblance to the partnership.[22]

---

[21] Petitioner's counsel indeed asserts in his posttrial brief that <u>Mandelbaum v. Commissioner</u>, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996), "sets a benchmark for lack of marketability discounts in the range of 35% to 45%", suggesting his belief that the Court in <u>Mandelbaum</u> established a legal standard in that regard to be followed in subsequent cases.

[22] Petitioner indeed states in his posttrial reply brief that "Petitioner did not rely on the factual basis of <u>Mandelbaum</u> or claim that the instant case should be similarly decided based on factual similarities".

c.  Mr. Stryker's Analysis

In his written report, Mr. Stryker cites a series of empirical studies known as restricted stock studies,[23] which, according to him, "center around a 30% marketability discount for transfers of restricted stock."  After analyzing the factors we reviewed in Mandelbaum v. Commissioner, supra,[24] Mr. Stryker concludes that "a discount of 40% was applicable to the freely traded value of Peracchio's interests.  (10 percentage points higher than the private placement studies.)"  Thus, Mr. Stryker derives his quantitative starting point (30 percent) from restricted stock studies.

While restricted stock studies certainly have some probative value in the context of marketability discount analysis, see, e.g., McCord v. Commissioner, 120 T.C. at 390-393, Mr. Stryker makes no attempt whatsoever to analyze the data from those studies as they relate to the transferred interests.  Rather, he simply lists the average discounts observed in several such studies, effectively asking us to accept on faith the premise

---

[23]  Restricted stock studies (also referred to by Mr. Stryker as private placement studies) compare the private-market price of restricted shares of public companies (i.e., shares that, because their issuance was not registered with the Securities and Exchange Commission (SEC), generally cannot be sold in the public market for a certain period of time without SEC registration) with the coeval public-market price of such companies' unrestricted shares.

[24]  Mr. Stryker also considers factors discussed in Rev. Rul. 77-287, 1977-2 C.B. 319, which are generally subsumed within the Mandelbaum factors.

that the approximate average of those results provides a reliable benchmark for the transferred interests.  Absent any analytical support, we are unable to accept that premise, particularly in light of the fundamental differences between an investment company holding easily valued assets (such as the partnership) and the operating companies that are the subject of the restricted stock studies.

3.  Analysis of Respondent's Expert

Unfortunately, Mr. Burns does not offer a satisfactory alternative to the inadequate analyses of petitioner's experts. Following a brief analysis of six factors "that may influence the size of the marketability discount", he concludes in his written report:

> It is reasonable to assume that a negotiation between buyer and seller would initially focus on a discount for lack of marketability in the range of 5% to 25%.  A discount above this range would not be justified for a conservatively-managed partnership holding highly liquid marketable securities and cash investments; while a discount below the range would ignore the costs and effort that might be required to find a willing buyer.  I believe that a fair outcome of such a negotiation between buyer and seller would entail an adjustment of approximately 15% to reflect marketability concerns.

In his testimony at trial, Mr. Burns confirmed that the lower limit of his suggested range of discounts (5 percent) represents the typical sales commission charged by brokers of interests in private limited partnerships.  However, he also testified that an additional discount (unspecified in degree)

would be warranted to account for the admittedly thin nature of that secondary market.  Regarding his suggested upper limit of 25 percent, Mr. Burns essentially testified that such figure derives from his attempt "to extricate somehow * * * from the restricted stock studies" the portion of the observed discount level which, in his opinion, readily translates to the transferred interests. Given the lack of quantitative evidence in support of that attempt, as well as Mr. Burns's tacit acknowledgment that the lower limit of his suggested range of discounts is understated, we are not persuaded by his opinion that the appropriate range of marketability discounts for the transferred interests is 5 to 25 percent.  We are even less impressed by his arbitrary selection of the midpoint of that range (15 percent) as his suggested discount.

    4.  Determination of the Marketability Discount

    Having expressed our dissatisfaction with the experts' respective analyses, we must nevertheless determine an appropriate marketability discount for the transferred interests. As noted above, respondent's expert states in his written report that a marketability discount above 25 percent would not be justified for an entity with the characteristics of the partnership.  We treat that statement as a concession that a marketability discount of up to 25 percent (rather than the arbitrarily selected 15 percent) would be appropriate for the

transferred interests.  Because petitioner has failed to carry his burden of persuading us that a figure in excess of 25 percent would be appropriate, we utilize a 25-percent marketability discount for purposes of determining the fair market value of the transferred interests.

D.  Valuation Conclusion

We conclude that the fair market values of the gifted interest and the sold interest on the valuation date were $644,446 and $757,972, respectively, determined as follows:[25]

| | |
|---|---|
| Total NAV | $2,010,370 |
| 1 percent of NAV | 20,104 |
| Less:  6-percent minority interest discount | (1,206) |
| Marketable value | 18,898 |
| Less:  25-percent marketability discount | (4,725) |
| FMV of 1-percent interest | 14,173 |
| FMV of 45.47-percent interest | 644,446 |
| FMV of 53.48-percent interest | 757,972 |

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[25]  For ease of computation, we determine the fair market value of a 1-percent interest.