T.C. Memo. 1996-156

UNITED STATES TAX COURT

ESTATE OF RUTH J. CASEY, DECEASED, FIRST INTERSTATE
BANK OF NEVADA, SPECIAL ADMINISTRATOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19512-94.                    Filed March 27, 1996.

<u>Casey W. Vlautin</u>, for petitioner.

<u>Paul L. Dixon</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a $716,355 deficiency in petitioner's Federal estate tax.  The parties have agreed to the fair market value of certain property included in the estate before the application of any discount, but they disagree about the amount of any such discount.

FINDINGS OF FACT[1]

Ruth J. Casey, decedent, was domiciled in California at the time of her death, May 2, 1990. Decedent was employed as a nurse by George Whittell (Whittell). Whittell died in 1969 leaving, among other things, a residence, along with the 50 acres of land on which it was situated (Residence), in trust for his wife for her life and then to decedent for her life, with a remainder to various charities. Whittell funded a trust (Maintenance Trust) with $1 million to maintain Residence. Whittell also created a trust for the support of decedent during her life (Support Trust).

Whittell's wife died in 1979, and decedent occupied Residence from that time forward. By the mid-1980's, Maintenance Trust was approaching depletion and contained less than $150,000, an amount which was anticipated to be insufficient to maintain Residence for decedent's remaining life expectancy. The Residence was appraised at market values of $3,740,000 and $5,400,000 during 1985 and 1986, respectively. A disagreement concerning the maintenance of Residence arose between decedent and the charitable remaindermen. The remaindermen asserted that it was decedent's obligation to maintain Residence and pay the taxes in the event the Maintenance Trust was insufficient. Decedent asserted that, if the Maintenance Trust was

---

[1] The parties' stipulation of facts and exhibits is incorporated by this reference.

insufficient, she would seek partition of her interest from that of the charitable remaindermen.

The dispute was settled during August 1987, and the parties agreed to the following: (1) The Support Trust would be terminated with its assets divided, 55 percent for decedent and 45 percent for the charitable remaindermen, and (2) the assets remaining in the Maintenance Trust (including Residence, its furnishings, and cash) would be distributed to a liquidating trust (Liquidating Trust). The Liquidating Trust was chosen in order to provide centralized management and to assist in representing the multiplicity of interests in selling the property. The Liquidating Trust was to terminate by approximately August 1990. The Liquidating Trust continued beyond its prescribed termination date due to controversy over the trustee's fees. Decedent had a 50-percent interest in the Liquidating Trust, and seven charitable organizations had varying percentage shares in the remaining 50 percent.

The Liquidating Trust instrument provided that, except for transfers by will or by the laws of intestate succession, no trust beneficiary could assign or transfer an interest to any party other than to another beneficiary. The express purposes of the Liquidating Trust were to:

> hold the property * * * [Residence and related assets from the Maintenance Trust], to liquidate the Property in an efficient manner, to manage and maintain the Property in an efficient manner during the process of

liquidation, and to effect eventual distribution of the proceeds of the Property to the beneficiaries * * *.

During 1989, the Liquidating Trust instrument was amended to permit decedent to transfer her interest to her living trust for estate planning purposes, and, in all other respects, the restrictions on alienation of an interest in the Liquidating Trust remained in force. The Liquidating Trust instrument could be amended only by the consent of at least 71 percent of the beneficiaries. The trustee of the Liquidating Trust had the power to sell Residence without the consent of the beneficiaries, and, accordingly, decedent's living trust had no direct control over the terms or conditions of the sale.

After Residence was placed in the Liquidating Trust, the trustee began receiving offers which, during 1988, ranged from $4,500,000 to $9,600,000, with the majority of them placing near $7 million. The offers were generally contingent on soil and geologic testing and, in some cases, approval to subdivide. The trustee, after deciding that the offers received up to that point were unacceptable, began looking for a wealthy purchaser in order to exploit Residence's unique character and to maximize its selling price. To avoid possible contingencies, the trustee, at the expense of the Liquidating Trust, caused soil and earthquake tests to be conducted during 1988 and 1989. An auction of the Liquidating Trust personalty, which attracted 2,500 people, was conducted during September 1989. Gross proceeds of the auction

were about $800,000, which resulted in a $100,000 cash distribution to decedent's living trust during December 1989.

All testing of the realty had been completed during the spring of 1990; thereafter, the trustee set a $24 million asking price for Residence. Decedent, throughout the entire time and until the date of her death on May 2, 1990, resided in Residence. The trustee received a $17,500,000 cash offer on June 8, 1990, from a former Apple Computer executive, which was accepted on June 11, 1990. The sale closed on June 29, 1990. Decedent's living trust received a $6,300,000 distribution during August 1990.

After the real estate closing, a dispute arose over the fee of the trustee of the Liquidating Trust. During September 1991, decedent's living trust received a $1,500,000 distribution from the Liquidating Trust. After the settlement of the litigation concerning the trustee's fee, an additional $190,000 was received by decedent's living trust. The parties agree that the Liquidating Trust's net value (without any discount) at the time of decedent's death was $16,779,630.

The original estate tax return, filed August 2, 1991, reported a $6,948,806 value for decedent's interest in the Liquidating Trust (including a 15-percent discount). Following respondent's issuance of the notice of deficiency, petitioner filed a refund claim using a 25-percent discount for marketability. Petitioner, at trial and on brief, seeks a 50-

percent discount, and respondent, on brief, seeks a 9.5-percent discount.

## OPINION

This case presents the recurrent issue of estate tax asset valuation. The parties have agreed to the undiscounted value of the asset at the time of decedent's death. The unresolved controversy concerns the percentage discount that should be applied. Petitioner argues that this case involves a fractional interest to which control and marketability discounts should be applied. Conversely, respondent argues that, in a case where the property is being liquidated, no control or marketability discount should be applied. Respondent, however, would adjust the agreed value for the time value of money or the time it takes to liquidate the property. Converting the parties' arguments to numerical equivalents, petitioner and respondent would apply discounts of 50 percent and 9.5 percent, respectively.

Property is generally included in the gross estate at its fair market value on the date of a decedent's death. Sec. 2031(a);[2] sec. 20.2031-1(b), Estate Tax Regs. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable

---

[2] Unless otherwise indicated, section references are to the Internal Revenue Code in effect on the date of decedent's death. Rule references are to this Court's Rules of Practice and Procedure.

knowledge of relevant facts."  United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989); Estate of Heckscher v. Commissioner, 63 T.C. 485, 490 (1975); sec. 20.2031-1(b), Estate Tax Regs.  All relevant facts and elements of value as of the applicable valuation date shall be considered in every case.  Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123, 125 (1944); Skripak v. Commissioner, 84 T.C. 285, 320 (1985); sec. 20.2031-1(b), Estate Tax Regs.

Valuation is an inexact process, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), and we may accept or reject in full or in part experts' opinions proffered by the parties.  Helvering v.  National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).  Petitioner bears the burden of proving that respondent's determination is in error.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987).

Petitioner's expert compares the Liquidating Trust to situations where partners or shareholders have a fractional interest in an entity which, in turn, holds real estate.  He then postulates that the value of the fractional interest is derived from the value of the underlying assets and/or potential earnings.  Finally, he explains that "Less-than-controlling equity interests in real property * * * may not be worth a pro

rata portion of a 100 percent (controlling) interest in the underlying net asset value." Petitioner's expert further explained that discounts are used to reflect a lack of control and/or marketability. A lack of control is the inability to change corporate or business attributes (dividends, capital, etc.). A lack of marketability is a reduced liquidity because of no ready market for part of a closely held entity. The expert then concluded that decedent's interest in the property, because it was held in the Liquidating Trust, had the same attributes as an interest in a corporation or partnership and should be subject to the same discounts. Following that conclusion and valuing the Liquidating Trust interest as though it were a commercial or investment activity, petitioner's expert reached a 30-percent discount for lack of control and a 30-percent discount for lack of marketability. After considering the sequential effect of the two discounts at about 51 percent, petitioner's expert opined that 50 percent was the appropriate combined discount for the lack of marketability and control.

Respondent's expert considered language contained in the Liquidating Trust that limited its purpose to the efficient liquidation of the trust property and the general prohibition from engaging in a trade or business. Although respondent's expert generally agreed with petitioner's expert's methodology, respondent's expert deemed petitioner's approach irrelevant, because the purpose of the trust was to liquidate assets and it

was not a "going concern". Instead, respondent's expert opined that a willing buyer would be concerned with the question of liquidity because of the time required to liquidate Residence. Accordingly, respondent's expert concluded that the agreed fair market value should simply be adjusted or discounted for the time value of money (i.e., the delay in realizing the liquidation value of the assets).

Respondent's expert used the May 1990 short-term Treasury rate of 7.8 percent and added a 2.2-percent premium to account for the lapse of time, arriving at a 10-percent discount rate. Respondent's expert noted that the long-term home mortgage rate was a comparable 10.3 percent during the same time period. Based on comparable properties, respondent's expert calculated a 12.4-month mean and 10-month median of time on the market. Using this information, respondent's expert arrived at a range of 9.5 to 11 percent for the discount and a value range of $7,355,141 to $7,478,238.

Petitioner, citing Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982), argues that a control discount applies because the liquidating trust is no different from a business entity holding property, and because decedent lacked control over the property because she owned less than a majority interest. Respondent agrees that the discount principles of Propstra v. United States, supra, would apply in a case where the property in question was used in a business. Respondent also agrees that

decedent did not have control over the asset. However, respondent emphasizes that the property was in a liquidating trust and not held for investment or as an operating asset in a business setting, and, accordingly, the typical reasons for applying a control discount do not exist in this case. Respondent also emphasizes that the trust document prohibited any business operation and its sole purpose was to liquidate the trust assets. See Estate of McMullen v. Commissioner, T.C. Memo. 1988-500.

Petitioner relies heavily on Propstra v. United States, supra, in which a husband and wife owned several parcels of realty as community property. In that case the Government argued that the taxpayer was required to show that the deceased spouse's community property interest would likely be sold apart from the other undivided interest. The Court of Appeals for the Ninth Circuit held that "unity of ownership" principles did not apply to property valuations for estate tax purposes. Propstra v. United States, supra at 1251.

Respondent argues that this case is factually outside the Court of Appeals' holding in Propstra because decedent had given her interest and all other beneficiaries had given theirs to the liquidating trustee for the express purpose of selling the property. We agree. The beneficiaries, by relinquishing their interests in the property and giving the trustee control and authority to sell, including the authority to decide the selling

price, transformed their undivided interests into a "unity of ownership" in the trustee.  That is not to say that a discount should not be applied for some other reason, but it does preclude a control discount.

The Liquidating Trust was not a business entity, and it should not be treated as a going concern.  The stated purpose of the trust was to liquidate or sell the realty so that a willing buyer would not be concerned about control, income, organization of the enterprise, etc.  Instead, the buyer would be purchasing the right to receive liquidation proceeds upon the property's sale.[3]

As a practical matter, the beneficiaries, by collectively releasing their individual interests to the trustee, have obviated most of the traditional concerns underlying the application of a control discount.  A potential buyer of a partial interest would look to the underlying value of the assets being liquidated.  Accordingly, we hold that no control discount should be applied to this situation.

The marketability discount relates to the question of liquidity.  Petitioner and respondent have addressed the liquidity question in different ways.  Petitioner, following the same approach as used for the control-discount question, treats

---

[3] The parties did not argue that there was any limitation on the sale or transfer of liquidation proceeds.  The parties agreed that an interest in the Liquidating Trust could be transferred with approval of at least 71 percent of the beneficiaries.

the trust as a business entity and uses real estate business examples (ostensibly comparable entities) to arrive at a 30-percent discount.  Respondent, on the other hand, depicts the question of liquidity as a time value of money concept, rather than a marketability discount issue.  Using time-value concepts, respondent arrives at a 9.5-percent discount to account for the delay in realization of the liquidated value.

We do not find it necessary to resolve the debate about which labels should be used.  We simply hold that a willing buyer would expect a discount for delay in the realization of the liquidated value.  In that regard, petitioner's approach to discounting is, in part, due to the fact that decedent had a fractional interest.  As explained above, because all of the fractional-interest holders gave up their right to control the liquidation of the property, the resulting effect is to enable the trustee to liquidate without conditions or hindrances from beneficial interest holders.  Those circumstances would have the effect of reducing any marketability discount.  Considering both approaches, we find that the agreed value of decedent's interest in the trust should be reduced by 15 percent to arrive at the fair market value for purposes of determining decedent's gross estate and petitioner's estate tax liability.

To reflect the foregoing,

Decision will be entered under

Rule 155.