**Arthur TEMPLE, Individually, and as Independent Executor of the Estate of Charlotte Dean Temple Plaintiff,**

v.

**UNITED STATES of America Defendant.**

No. 9:03 CV 165(TH).

United States District Court, E.D. Texas, Lufkin Division.

March 10, 2006.

George William Connelly, Larry Alan Campagna, Lawrence William Sherlock, Chamberlain Harlicka White Williams et al, Houston, TX, George Edmond Chandler, Chandler Law Offices, Lufkin, TX, for Plaintiff.

Jonathan L. Blacker, Christopher Randy Egan, Department of Justice, Dallas, TX, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

HEARTFIELD, District Judge.

This is a civil action for the recovery of federal gift taxes and related interest. Plaintiff Arthur Temple ("Temple"), individually and as independent executor of the estate of his wife, Mrs Charlotte Dean ("Lottie") Temple, alleges that the federal government, through the Internal Revenue Service ("IRS"), erroneously and wrongfully assessed and collected gift taxes from Temple and from the estate of Mrs. Lottie Temple. Specifically, Temple demands judgment in his favor in the amount of approximately $5,846,708, plus interest,

and for costs and other relief that may be provided.

The Court conducted a bench trial of this matter from June 27, 2005, through June 29, 2005. Having carefully considered the weight and credibility of all oral and documentary evidence and the respective arguments and post-trial submissions of the parties, the Court finds that Temple has established his right to over $7 million in federal gift tax and interest. The following findings of fact and conclusions of law are issued under Rule 52(a) of the Federal Rules of Civil Procedure.

FINDINGS OF FACT

1. Temple is a United States citizen and resides in Diboll, Texas. (Joint Pretrial Order ("JPO") Stipulation # 1; Trial Transcript ("Tr.") 28).

2. Born and raised in Texarkana, Arkansas (Tr. 28), Temple eventually moved to the Piney Woods of East Texas, where he worked to become a leader of the timber industry (Tr. 40–41).

3. Temple expanded his lumber and sawmill interests and eventually operated a publically traded corporation with sales approaching $2 billion dollars per year (Tr. 41–42, 43–44, 162–63).

4. Although he resigned from executive leadership in the timber industry, Temple remains active in banking and charitable operations (Tr. 45–47, 57–58).

5. Temple and his wife Lottie had two children, Arthur Temple, III ("Buddy Temple") and Charlotte Ann Temple.

6. Lottie Temple died on March 7, 2002, and Temple was appointed the independent executor of her estate on March 25, 2002 (JPO, Stipulation # 2).

7. In 1997 and 1998, Temple gave gifts of his interests in four separate entities: Ladera Land, Ltd. ("Ladera" or "Ladera Land"), Boggy Slough West, LLC ("Boggy Slough"), Temple Interests, L.P. ("Temple Interests"), and Temple Partners, L.P. ("Temple Partners"). Temple gifted these interests to his children, Buddy Temple and Charlotte Temple and created trusts for his grandchildren: Whitney Sage Temple Lightsey, Susan Helen Temple, Hannah Lea Temple, John Clark Hurst, Jr., W.H. Spencer, IV, Christopher Temple Spencer, Katherine Sage Spencer, and Arthur Latane Spencer. Additionally, a gift was given to Ellen Temple, the Temples' daughter-in-law. (JPO, Stipulation # 3).

8. The key issue in this case involves the fair market value ("FMV") of gifts given by Temple of his interests in Ladera, Boggy Slough, Temple Interests, and Temple Partners.

9. Ladera was formed to own and operate a ranch in South Texas.

10. Boggy Slough was formed to own and operate a winery in Napa County, California.

11. Both Temple Interests and Temple Partners (collectively, the "Temple Partnerships") were formed to own the stocks of Temple–Inland and Time Warner. These companies are publically traded Fortune 400 companies.

12. Temple's gifts of his interests in Ladera, Boggy Slough, and the Temple Partnerships transferred over $34 million of assets to his children and grandchildren.

13. Temple and his wife split the gifts provided in 1997 and 1998, with each person filing federal gift tax returns. They each timely filed United States Gift (and Generation–Skipping Transfer) Tax Returns (Form 709) for the 1997 and 1998 tax years. They also timely paid the gift tax originally reported on the returns. See Forms 709, Government Exhibits ("GX") 1–4; see also Joint Stipulation No. 5, Paragraph E of the JPO.

14. After an audit, the IRS considered the Ladera, Boggy Slough, and Temple Partnerships to be undervalued. (JPO, Stipulation # 6). The IRS increased the value of the gifts and assessed additional gift tax. For 1997, the IRS assessed $1,313,450 in gift tax and $455,109 in interest against Temple, and $1,314,400 in gift tax and $455,438 in interest against Lottie Temple. GX 5–6 and 9–10; see also JPO Stipulation # 7.

15. For 1998, the IRS assessed $891,568 in gift tax and $262,683 in interest against Temple and $891,567 in gift tax and $262,493 in interest against Lottie Temple. See GX 11–12; see also JPO Stipulation # 7.

16. The Temples paid these assessments and timely filed claims for refund with the IRS. See JPO Stipulation # 8.

17. Temple seeks a refund of $1,768,559 for 1997 and $1,154,251 for 1998. See Complaint, ¶ 7. The Estate of Lottie Temple seeks $1,769,838 for 1997 and $1,154,060 for 1998. Id.

18. The Temples' refund claims satisfy the statutory requirements listed in Internal Revenue Code (26 U.S.C.) § 6511. The IRS has disallowed the Temple refund claims. See JPO, Stipulations 8 and 9.

19. A critical factor in this case is determining the appropriate diminution in value between a hypothetical willing buyer and hypothetical willing seller for the interests in Boggy Slough and the Temple Partnerships.

20. Determining the "net asset value" ("NAV") of Ladera, Boggy Slough, and the Temple Partnerships is the first step in resolving this case.

21. After the NAV is calculated, the Court must then determine whether a discount to the value of the gifts is appropriate.

22. If a discount is appropriate, the Court must determine the extent of the discount.

23. Once the discount amount is determined, the fair market value for all of Temple's gifts must be calculated.

### Ladera Land

24. Ladera Land was formed on August 25, 1992. *See* JPO Stipulation # 10.

25. As a limited partnership, Ladera Land is comprised of two partners: Temple Land and Cattle Company ("TLCC") and Temple. TLCC, as the general partner, received a 1% partnership interest. Temple received a 99% limited partnership interest. Buddy Temple was the president of TLCC.

26. Ladera's term runs until December 31, 2025, or until such time as termination occurs in accordance with the partnership agreement.

27. The Ladera partnership agreement states that Ladera's purposes were to (I) acquire real property (the Gray ((Temple)) Ranch), (ii) acquire, raise, and breed livestock,

(iii) develop and lease the real property for hunting and wildlife management, and (iv) such other purposes consistent with farming and ranching operations. *See* GX 13.

28. Buddy Temple testified that Ladera's purpose was "to own the land and to hope that it appreciated in value and some day we might sell it." (Tr. 91).

29. Ladera Land's general partners retain exclusive authority to manage the operations and make all business decisions. *See* GX 13, Tab 2. Ladera's limited partners do not have the right to manage and control the business. *Id.*

30. In 1992, Temple first gifted his Ladera limited partnership units to Buddy Temple (both individually and as Trustee of the South Texas Land Trusts) and to Ellen Temple. *See* GX 15.

31. The South Texas Land Trusts were formed to benefit Temple's grandchildren. Temple gave similar gifts of his Ladera partnership units from 1993–1996. *See* GX 17–20.

32. Temple's Ladera Land gifts from 1992–1996 were discounted 40%. *See* GX 15—20. No appraiser was used on these gift valuations prior to the gifts. (Tr. 191).

33. The composition of Ladera Land's financial structure, assets, and liabilities did not change between 1992 and 1997. *See* GX 28.

34. Temple transferred 490.008 limited partnership units (representing 49.0008% of Ladera) to Buddy Temple, Ellen Temple, and his grandchildren on February 24, 1997. Buddy Temple received a 42.3343% limited partnership inter-

est. Ellen Temple and Temple's grandchildren each received 1.3333% limited partnership interests. Ladera's NAV was $3,583,064, consisting of the following assets and liabilities: cash and equivalents—$13,709, tractors—$42,355, Temple Ranch—$3,6000,000 [1], and a note payable of $73,000. *See* GX13.

35. In 1992 through 1996, Temple valued his previous Ladera gifts with a 40% total discount.

36. From 1992 through 1997, Ladera's assets, liabilities, and financial structure did not change.

37. However, Temple attempted to increase the Ladera discount in 1997. He hired Nancy M. Czaplinski ("Czaplinski") to appraise the value of his 1997 gifts. Czaplinski calculated the discounts at a higher percentage than the 40% used by Temple from 1992 through 1996.

38. Czaplinski valued Temple's gifts by using a minority interest (lack of control) discount of 25% and a lack of marketability discount of 45%. The total combined discount was roughly 58.75%. The undiscounted fair market value of Temple's Ladera gifts in 1997 was $1,755,730. Czaplinski's calculations, however, discounted the Ladera gifts to $731,205.

## Boggy Slough West LLC

39. Boggy Slough was formed as a California limited liability company on July 29, 1995. Temple gave $2,000,000 in exchange for a 99% membership interest. Charlotte Temple contributed $20,202 in exchange for a 1% membership interest. Charlotte became the managing member of Boggy Slough. *See* GX38. Boggy Slough's term runs through December 31, 2050 (or until termination under the operating agreement). *Id.*

40. Boggy Slough was formed to acquire real property, operate a vineyard, produce and sell grapes, engage in ranching and other agricultural activities. In 1995, Boggy Slough purchased a ranch in Napa County, California. This ranch consisted of approximately 477 acres. (Tr. 115).

41. Under the Boggy Slough Agreement, the managing member controls all operations and affairs and decides all business and financial matters. The managing member can purchase, sell, or lease Boggy Slough's real and personal property. *See* GX 38.

42. Section 9.1 of Boggy Slough's Agreement states that Boggy Slough shall dissolve upon the occurrence of (i) the happening of any event of dissolution specified in the Articles of Organization, (ii) the entry of a decree of judicial dissolution,(iii) the vote of members holding at least 51% of the membership interests, (iv) the occurrence of a "Dissolution Event" and the failure of the other members to consent to continuation of the business, or (v) the sale of all or substantially all of the assets. *See* GX 38. Any member with 51% or larger membership can trigger dissolution of Boggy Slough. (Tr. 582) Section 9.2 requires that, upon dissolution, Boggy Slough's assets shall be disposed of and its affairs wound up. *Id.*

---

1. As appraised by William J. Lyon & Associates as of February 1, 1997.

*See also* (Tr. 583). There is no mandatory manner for disposing of the assets.

43. Temple gave 331.31 units of his Boggy Slough non-managing member interests to both Charlotte Temple and the Spencer Children's 1995 Trusts in 1996. The Spencer Children's trusts were formed for the benefit of Temple's grandchildren: W.H. Spencer IV, Christopher Temple Spencer, Katherine Sage Spencer, and Arthur Latane Spencer. *See* GX33.

44. Temple valued these 1996 gifts using a 40% minority interest discount. *See* GX34. Boggy Slough's assets, liabilities, and financial structure did not change between 1996 and 1997. (Tr. 134); *see also* GX41.

45. In 1997, Temple transferred 17,186.90 units (83% of Boggy Slough) to Charlotte Temple and the Spencer Children's 1995 Trusts. *See* Joint Stipulation No. 19. Charlotte Temple received a 76.6% non-managing membership interest, and Temple's grandchildren each received a 1.6% non-managing membership interest. Boggy Slough's NAV was $2,189,581, and was made of the following: cash & equivalents—$34,500, Boggy Slough Ranch—$2,160,000 [2]—and liabilities of $4,919. *See* GX 32.

46. Temple hired Czaplinski to appraise the value of his 1997 Boggy Slough gifts. Boggy Slough's assets, liabilities, and financial structure did not change from 1996 to 1997. However, Czaplinski discounted the gifted units at a rate higher than 40%, which was the discount rate used one year prior in 1996.

47. Although Boggy Slough and Ladera had different locations, operations, structures, and rights and obligations, Czaplinski valued the Boggy Slough gifts with the same discounts as her Ladera appraisal. The undiscounted FMV of Temple's 1997 Boggy Slough gifts was $1,817,352. Temple asserts that the 1997 Boggy Slough gifts are worth $749,519.

## Temple Interests and Temple Partners

48. Temple formed a number of interests and partnerships to further plan his estate. Temple Interests was formed between Temple, Buddy Temple, and Temple Southwood, Inc., a Texas corporation. *See* Joint Stipulation No. 20. Temple Partners was formed between Temple, Charlotte Temple, and Temple Westwood, Inc., a Texas corporation. *See* Joint Stipulation No. 27. Temple Interests and Temple Partners ("Temple Partnerships") were both formed in February of 1997.

49. In March 1997, Temple transferred 163,940 shares of Temple–Inland stock with a FMV of $6,534,375 to the Temple Partnerships. He received a 1% general partnership interest and a 98% limited partnership interest. *See* GX 46, 47.

50. Buddy Temple contributed 2,823 shares of Temple–Inland stock with a FMV of $155,794.31 and $23.83 in cash to Temple Interests in exchange for a .01% general partner-

---

**2.** Appraisal performed by Associated Appraisal Service Partners, Inc., valuing Boggy Slough Ranch at $2,160,000.

ship interest. *Id.* Temple Southwood gave $1,573.92 in cash for a .01% general partnership interest. *Id.* Charlotte Temple gave 2,308 shares of Temple–Inland stock with a FMV of $127,372.75 and 652 shares of Time Warner with a fair market value of $28,402.75, and $42.64 in cash to Temple Partners. She received a .99% partnership interest. *Id.* Temple Westwood gave $1,573.92 in exchange for a .01% general partnership interest. Temple Southwood and Temple Westwood were both formed on February 14, 1997. *See* GX 56, 63.

51. The Temple Partnerships were created to last 50 years or until such time as termination occurs under the partnership agreement. *See* (i) Partnership Agreement of Temple Interests, L.P. ("Temple Interests Agreement"), GX54, and (ii) Partnership Agreement of Temple Partners L.P. ("Temple Partners Agreement"), GX82 (collectively the "Temple Partnership Agreements").

52. The Temple Partnerships were formed to own and operate partnership property, to hold and manage partnership property for maximum gain, to dispose of property, and engage in lawful business activities. Charlotte Temple referred to the Temple–Inland stock as the "family jewels" (Tr. 123), and Temple stated that the Temple–Inland stock was meant to be kept within the family. (Tr. 70).

53. Besides holding and managing the Time Warner and Temple–Inland stock, the Temple Partnerships did not conduct business operations in 1997 or 1998. (Tr. 99).

54. The Temple Interests general partner has the sole right to manage and control the partnership's business. *See* GX 54 and GX 82. Limited partners cannot manage or control the partnership's affairs. *Id.* Buddy Temple handled Temple Interests' day-to-day activities instead of his father. (Tr. 100–101).

55. Should a limited Temple Interests or Temple Partners partner receive a "bona fide offer" from a person, and the transfer of the partnership interest cannot be permitted as a "Permitted Transfer," the limited partner can transfer his interest after giving the partnership and the other partners the right to purchase the interest. *See* Temple Interests Agreement, GX 54 and GX 82.

56. Temple gave 1% of limited partnership interests in the Temple Partnerships to the St. Cyprian's Episcopal School ("St.Cyprian's") in April of 1997. *See* GX 49, GX 74. In June, he gave 45% limited partnership interests to Buddy Temple (for Temple Interests) and to Charlotte Temple (for Temple Partners). *See* GX 50, GX 75. In January of 1998, Temple gave identical 44.24% limited partnership interests in the Temple Partnerships to Buddy and Charlotte Temple and 0.19% limited partnership interests to his grandchildren. *See* GX 51, GX 76.

57. On January 9, 1998, Temple Interests' NAV was $17,622,470. *See* GX 53. Temple Partners' NAV was $17,704,956. *See* GX 72.

## Valuing Temple's Gifts

### A. Temple's Valuation of the Ladera Land Gifts

58. When valuing the Ladera gifts for Temple, Czaplinski spoke with Mr.

Jack Eckels, Temple's attorney. She also reviewed Ladera balance sheets and income documents for 1996 and the period ending March 31, 1997. Tr. At 208–09, 1.23–1.7. Czaplinski did not discuss the Ladera valuations with Temple, Buddy Temple, or anyone else associated with Ladera. Tr. At 256, 1.9.

59. Czaplinski used the NAV approach to value the Ladera gifts. Tr. At 207–208, 1.24–1.20. She then calculated the discounts she deemed appropriate. She determined a minority interest discount of 25% and a lack of marketability discount of 45%, for a total combined Ladera Land discount of approximately 58.75%.

60. Czaplinski based her 25% minority interest discount on "the inverse of the premium for control." Tr. At 264.1.3–6 (Czaplinski's deposition testimony). Czaplinski used a study of the inverse of premiums paid to acquire control of public companies published by the Mergerstat Review (the "Mergerstat Study"). Czaplinski testified at trial that the Mergerstat Study is a study of operating companies, but that she classified Ladera Land as a holding company. Tr. 264, 1.-.13.

61. Another expert hired by Temple, Mr. Charles L. Elliot ("Elliot"), recognized problems with the Mergerstat Study. When asked if he relied on the control premium study (the Mergerstat Study) to compute a lack of control discount, Elliot stated "not a bit." Tr. 382, 1.16.

62. Elliot explains that the Mergerstat Study involves sales of entire public companies from which the lack of control discount is computed, and not the purchase of specific percentage interests. Tr. at 383–384, 1.22–1.1. He stated that he does not use the Mergerstat Study to value a limited partnership interest holding real estate. Tr. 384, 1.2–19.

63. Czaplinski also characterized Ladera as weak on nine out of ten attributes normally associated with investment companies. Tr. 274, 1.22–24. However, she did not interview or talk to Buddy Temple or anyone else involved in Ladera operations before evaluating the company. *Id.*

64. Czaplinski used the "Quantitative Marketability Discount Model" ("QMD Model") developed by Z. Christopher Mercer to assess the 45% lack of marketability discount for Ladera Land.

65. Czaplinski assumed the following: (i) the holding period of a Ladera partnership interest is between 10 and 15 years (Tr. 242), (ii) the minority investor requires a holding period return on investment of 18–20% (Tr. 242), (iii) Ladera's distribution yield is 5% (Tr. 243), and (iv) the expected appreciation of Ladera's real property is 3% (Tr. 243–244). These assumptions were used without talking to anyone associated with Ladera.

66. There is no holding period requirement in the Ladera Agreement. However, under the QMD Model used by Czaplinski, the longer the holding period, the higher the discount.

67. Czaplinski also assumed the stock market rate of return to be approximately 15%, and assumed that an additional 3% to 5% holding period return on investment would be re-

quired by a minority interest investor, referring to this 3% to 5% as a "kicker". Tr. 242–43.

68. Czaplinski assumed a 5% distribution yield for Ladera Land, although neither Ladera nor Boggy Slough were making distributions. Tr. 243.

69. Czaplinski also assumed that the expected appreciation of Ladera property to be 3%. This number was not based on real estate appraisals by Temple and provided to Czaplinski. Rather, Czaplinski simply arrived at this number through a verbal conversation with someone in her firm's real estate department. Tr. 243–44;. Tr. 284. There was no specific effort to tie this additional 3% discount to specific instances of South Texas real estate holdings similar to Ladera Land.

70. After plugging all of these discounts into the QMD Model, Czaplinski arrived at a 45% marketability discount. Tr. 276–77.

71. Temple's final valuation· for the Ladera Land gifts was $631,725 for the 423.343 ownership units given to Buddy Temple and $19,896 for the five groups of 13.333 units split between Ellen Temple and Temple's grandchildren, for a discounted total of $731,205.

## B. Temple's Valuation of the Boggy Slough Gifts

72. On the date of Temple's Boggy Slough gifts, Boggy Slough's NAV was $2,189,581. See GX 32. The NAV for the 76.6% gifted interest to Charlotte Temple is $1,677,219, while the NAV for the 1.6% gifts given to Temple's grandchildren is $35,033. Id.

73. Boggy Slough is a private limited partnership that is not traded on the on the secondary market.

74. The Boggy Slough Agreement, Section 9.1C, provides that "[t]he Company shall dissolve upon . . . vote of Members holding at least fifty one percent (51%) of the Membership Interests." The manager is required to dispose of assets in the members' best interests and in the manner of an ordinarily prudent businessman.

75. There is no mandatory manner of dissolution under the Boggy Slough Agreement. The members (or member) holding at least fifty one percent could sell the Boggy Slough Property in the event of liquidation and dissolution, or distribution of property in kind could be used. Because Boggy Slough is real property, any distribution of property would be as undivided interests to the members as tenants in common.

76. Plaintiff presented Mr. William J. Lyon ("Lyon") to testify on the 76.6% gift of Boggy Slough. Mr. Lyon is a Senior Residential Appraiser, MAI, and a Senior Real Estate Analyst (Tr. 597–599). A key consideration for the dissolution of an undivided interest in property is the absolute lack of control any individual has with respect to the property, regardless of the size of the interest, or part of that interest that is owned. (Tr. 601–603).

77. Co-owners can create numerous problems as part of the dissolution process. Id. A major factor that impacts the valuation of any inter-

est is the use of the property itself. (Tr. 602–603).

78. The Boggy Slough property could be partitioned no more than one time because of zoning limitations, topography, and the varying values of parts of the land in question. (Tr. 603–604). Boggy Slough could only be divided into two tracts because of local zoning provisions. (Tr. 619). The Boggy Slough property contains three types of land with varying values. Mountainous land is valued at $800 per acre, pasture land at $1,800 per acre, and vineyards are valued at $8,500 per acre. (Tr. 623–24). Mr. Lyon could not determine a partitioning approach, by either value or area, that would allow Boggy Slough to stay within the zoning restrictions. (Tr. 624).

79. Czaplinski, on Temple's behalf, ultimately calculated a 25% discount for lack of control and a 45% discount for lack of marketability for Boggy Slough. Lyon's valuations support Czaplinski's calculations.

80. Temple's valuations of the Boggy Slough gifts therefore amounted to $691,727 for the 15,861.66 ownership units and $14,448 for the four groups of 331.31, bringing the total amount to $749,519.

## C. Temple's Valuation of the Temple Partnership Gifts

81. Temple Interests and Temple Partners are identical partnerships (Tr. 412) and the valuation method for each of the two partnerships should be the same (*Id.*).

82. Temple Partnerships consists of Temple–Inland and Time Warner stock. Both Temple–Inland and Time Warner are diverse, multi-faceted corporations. *See* GX53, GX72. Time Warner is in the publishing, broadcasting, film, professional sports, and music industries. Temple–Inland produces paper and building products, lumber, owns forest land, and provides financial services. *Id.*

83. Mr. Frances Burns, government expert, properly used the cost (NAV) approach in valuing the Temple partnership gifts. He reviewed the financial statements and brokerage accounts for the partnerships. (Tr. 414). Burns correctly used the average of the high and low price on the date of valuation in accordance with the United States Treasury Regulation Section 2512. (Tr. 415).

84. Because a minority ownership stake may be worth less than the pro-rata share of the Temple Partnerships' total value, Burns applied a minority interest discount.

85. The Temple Partnerships are essentially investment holding companies with a fixed number of units outstanding, and as such, are analogous to closed-end funds. (Tr. 416).

86. Burns relied on a published weekly list of closed end funds. This list showed a fund's discount / premium to NAV. *See* Tab 8 to GX53 and Tab 9 to GX72.

87. The Temple Partnerships' minority interest discounts, which were based on the mean discounts to NAV listed for the three valuation dates are as follows: April 11, 1997: 7.5%, June 5, 1997: 10.1%, and January 9, 1998: 3.3%.

88. This general approach by Burns closely resembled the method used

by Temple's expert, Mr. Charles Elliot. However, Elliot excluded some of the funds used by Burns. (Tr. 384–385).

89. Elliot's testimony that a sale of stocks would subject the Temple Partners to a large capital gain is contradictory to I.R.C. § 704(c)(1) and Treas. Reg. § 1.704–3. These provide that any built-in capital gain present at the contribution of the assets to a partnership is generally allocated to the contributing partner. Thus, the only partner subject to capital gains would likely be Temple.

90. Elliot's testimony that the Temple Partnerships stock could not be sold to diversify the portfolio directly contradicts the trial testimony of Charlotte Temple, who stated that she sold some of the Temple Partners stock to diversify her holdings. (Tr. 121–122).

91. Burns did not exclude any funds from his valuation analysis. (Tr. 416–418). Burns also estimated the minority interest discounts by using the average discount of the group of closed-end funds rather than using a higher or lower percentile (as did Elliot). (Tr. 418–419).

92. Burns applied a marketability discount because the Temple Partnerships are private partnerships with a smaller market. Burns calculated this discount by considering (i) restricted stock studies, (ii) academic research, (iii) the costs of going public, (iv) secondary market transactions, (v) asset liquidity, (vi) partnership interest transferability, and (vii) whether distributions were made. *See* GX 53, GX 72; (Tr. 419–420).

93. The Temple Partnerships were made of highly liquid stocks (Time Warner and Temple–Inland). The Temple Partnerships each distributed 95% and 100% of dividends in 1997 and 1998, and the partners can transfer their interests to any other party or third party (if the other partners are given a right of first refusal). *See* GX53, GX72. Burns used this data to develop a reasonable discount for the Temple Partnerships.

94. Although the Temple Partnerships have a 50 year term, there is no holding period requirement for Temple Partnership interest. Partners do not have to hold their interests for a specific period of time. If a partner finds a willing buyer, and the partnership or other partners do not wish to purchase the interest, a partner is not prohibited from selling to a third party. Furthermore, the Court finds that it is inappropriate to assume a particular holding period for the hypothetical buyer. *See* (Tr. 424–25).

95. Because of the diverse range of business operations involved with the Time Warner and Temple–Inland stock, the volatility of the Temple Partnerships' assets was effectively a neutral factor. (Tr. 425).

96. Burns studied the evolution of restricted stock studies and the underlying market dynamics of restricted stock sales. *See* (Tr. 421); *See also* GX 53 and GX 72, pp. 11–12. He also looked at academic

research[3] that has been deemed relevant for computing a lack of marketability discount[4].

97. When taking all of the above factors into consideration, the Court is of the opinion that Burns's marketability discount of 12.5% for the Temple Partnerships is the proper approach.

98. An additional expert employed by Temple, Mr. Robert Oliver ("Oliver"), arrived at a higher lack of marketability discount than the one calculated by Burns. However, the Court finds that, so far as Oliver's calculations depend on a fifty year holding period, they are not well taken and that Burns's approach is the more accurate one.

99. Elliot and Burns provided conflicting opinions on whether a discount for built-in capital gains is applicable. When a partnership interest is valued, I.R.C. § 754 allows the partnership (i.e., the general partner) to elect to increase the buyer's basis in the partnership assets to an amount equal to the basis in the acquired partnership interest. A willing buyer can then avoid any future tax liability.

100. Both Elliot and Burns took the same positions in *Estate of Jones v. Commissioner*, 116 T.C. 121, 2001 WL 233964 (2001). Burns argued that there should be no discount for built-in capital gains and Elliot argued that there should be such a discount. The Tax Court held that there is no discount for built-in capital gains

because it is likely that the hypothetical buyer and seller would negotiate with the understanding that the election would be made and the price itself would not reflect a discount for built-in gains.

101. For the Temple Partnerships, the minority interest discounts of 7.5%, 10.1%, and 3.3%, respectively, apply to the gifts made on April 11, 1997, June 5, 1997, and January 9, 1998.

102. Additionally, a lack of marketability discount of 12.5 % applies to the Temple Partnership gifts.

103. With respect to Temple Interests, the value of the gift to St. Cyprians is $119,270, the value of Buddy Temple's June 5, 1997 gift is $5,948,927, the value of the gift made to Buddy Temple on January 9, 1998 is $6,611,517, and the value of each of the gifts made to Ellen C. Temple and Temple's grandchildren is $28,395.

104. For Temple Partners, the value of the gift to St. Cyprians is $119,276, the value of the gift to Charlotte Temple on June 5, 1997 is $5,948,843, the value of the gift made to Charlotte Temple on January 9, 1998 is $6,627,421, and the value of each of the gifts made to Temple's grandchildren is $28,463.

105. The underlying pro-rata FMV of all of Temple's 1997 and 1998 gifts totaled $34,908,239.

106. Discounts apply to Temple's gifts of Ladera Land, Boggy Slough, and the Temple Partnerships. For Ladera Land and the Temple

---

**3.** Mukesh Bajaj, David J. Denis, Stephen P. Ferris, & Atulya Sarin, *Firm Value and Marketability Discounts,* Journal of Corporation Law. 27: 89–115 (2001).

**4.** *Lappo v. Commissioner,* 86 T.C.M. (CCH) 333 (2003); *McCord v. Commissioner,* 120 T.C. No. 13 (2003).

Partnerships, Burns's valuations are correct. For Boggy Slough, the Court finds by a preponderance of evidence that portions of Temple's calculations are supported under both California law and in conjunction with the work of Temple's real estate expert William Lyon.

107. By a preponderance of all evidence and testimony adduced at trial, Temple is factually entitled to recover over $7 million in discounts from the United States.

108. Any Conclusion of Law which is more properly considered a Finding of Fact is incorporated here by reference.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a)(1).

2. Venue is proper in this district and division pursuant to 28 U.S.C. § 1402(a)(1).

■ 3. In a non-jury trial, credibility choices and the resolution of conflicting testimony are the province of the trial judge. *Justiss Oil Co., Inc. v. Kerr-McGee Refining Corp.,* 75 F.3d 1057, 1067 (5th Cir.1996).

4. I.R.C. § 2501(a) imposes a tax for each calendar year on the transfer of property by gift during the calendar year. The general theory is simply that the tax is equal to the amount of the gift multiplied by the appropriate tax rate.

5. I.R.C. § 2512(a) states that if a gift is made in property, the value of the property on the date of the gift is considered to be the amount of the gift. Treas. Reg. § 25.2512–1 provides that the value of property for gift tax purposes is "the price at which such property would change hands between a willing buyer and a will-ing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts." *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). *See also* Rev. Rul. 59–60, 1951–1 C.B. 237 (setting forth numerous criteria considered in determining fair market value). The Treasury Regulations also mandate that "[a]ll relevant facts and elements of value as of the time of the gift shall be considered." Treas. Reg. § 25.2512–1.

■ 6. It is imperative to remember that the willing buyer and willing seller are hypothetical persons rather than specific individuals or entities, whose characteristics are not necessarily the same as those of the donor and donee. *Estate of Newhouse v. Commissioner,* 94 T.C. 193, 218, 1990 WL 17251 (1990)(*citing Estate of Bright v. United States,* 658 F.2d 999, 1006 (5th Cir.1981)). The hypothetical willing buyer and willing seller are presumed to be economically rational and dedicated to achieving the maximum economic advantage for transactions involving their property. *Estate of Watts v. Commissioner,* 823 F.2d 483, 486 (11th Cir.1987).

■ 7. Valuation evidence is often presented in the form of appraisals by expert witnesses. District courts must weigh this testimony in light of the expert's qualifications and methodology and other credible evidence, and they have broad discretion to evaluate "the overall cogency of each expert's analysis." *Sammons v. Commissioner,* 838 F.2d 330, 333–34 (9th Cir.1988). Courts are not bound by the formulas and opinions proffered by experts, but may accept or reject expert testimony in whole or in part in the exercise of its sound judgment. *See Helvering v. National Grocery Co.,* 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346 (1938); *Rutter v. Commissioner,* 853 F.2d 1267, 1274–75

(5th Cir.1988). If necessary, courts may reach a determination of value based on their own examination of the evidence. *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir.1976). Because valuation necessarily results in an approximation, the figure arrived at by the court need not be one as to which there is specific testimony, if it is within the range of value that may properly be arrived at from consideration of all the evidence. *See Estate of O'Connell v. Commissioner*, 640 F.2d 249, 252 (9th Cir.1981); *Silverman*, 538 F.2d at 933.

◼ 8. For closely held interests, courts may apply a discount to reflect the value a buyer may place on things such as managerial control, ability to resell shares, and other risks. *Estate of Godley v. Commissioner*, 286 F.3d 210, 214 (4th Cir.2002). Minority interest discounts can be applied to account for a limited partner's lack of rights generally associated with managing or controlling a partnership. *Estate of Godley*, 286 F.3d at 214. The question of whether a discount applies depends upon the facts and circumstances of each case. *Id.* Courts often examine control elements such as the right to unilaterally direct corporate action, select management, decide distribution amounts, reorganize capital structure, and deciding whether to liquidate, merge, or sell assets. *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 251–52, 1990 WL 17251 (1990).

◼ 9. When a ready market for interests in private partnerships is not available, courts may apply a lack of marketability discount to make up for the loss of liquidity. *See Estate of Casey v. Commissioner*, 71 T.C.M. (CCH) 2599, 1996 WL 135691 (1996); *Peracchio v. Commission-*

*er*, 86 T.C.M. (CCH) 412 (2003); *Lappo v. Commissioner*, 86 T.C.M. (CCH) 333 (2003); *McCord v. Commissioner*, 120 T.C. No 13 (2003).

◼ 10. The question of whether to apply a discount rests on the facts of each case. *Estate of Ford v. Commissioner*, 53 F.3d 924, 926 (8th Cir.1995). Courts may adjust upward or downward for such factors affecting value as minority discounts, discounts for lack of marketability, discounts for lack of control, premiums for control, and discounts for fractional interests. *Estate of Stevens v. Commissioner*, 79 T.C.M. (CCH) 1519 (2000).

### Valuation of the Ladera Land Gifts

◼ 11. In valuing Temple's Ladera Land gifts, the Court adopts Burns's approach to determining the discounts. Burns considered *Estate of Jones v. Commissioner*, 116 T.C. 121, 130, 2001 WL 233964 (2001)[5] in valuing discounts for Ladera Land.

12. As previously mentioned, Burns examined more than the one partnership within the Partnership Spectrum study whose classification was similar to Ladera. The Court supports Burns's examination of average discounts for limited estate partnerships holding primarily real estate assets. (Tr. At 443). Burns's analysis allows for numerous data points and assists the Court in arriving at a reasonable discount for Ladera Land.

13. The Court concludes, based upon a preponderance of the evidence, that Temple's Ladera Land gifts should be discounted by 33% for a combined lack of marketability and lack of control and that an additional incremental lack of marketa-

---

**5.** Numerous Courts have recognized the special guidance and expertise of the Tax Court for tax cases. *See, e.g., Yarbro v. Commissioner*, 737 F.2d 479, 483 (5th Cir.1984), *cert.* *Denied*, 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985); *see also Minnesota Lawyers Mut. Ins. Co. & Subsidiaries v. Commissioner*, 285 F.3d 1086, 1092 (8th Cir.2002).

bility discount of 7.5% applies to Ladera's partnership interests because of their status as private and non-registered interests.

14. The Court recognizes that there is no single way to determine Ladera's discounts. The Court considered Czaplinski's calculations, reports, and testimony as to Temple's Ladera Land gifts. However, Czaplinski's Ladera Land holding period assumptions (Tr. 242) are enough, in the absence of a holding period requirement in the Ladera Agreement, to concern the Court with the reliability of that aspect of Czaplinski's calculations.

15. The Court does not find a discount for potential unrealized capital gains to be applicable. I.R.C. § 754 allows a buyer to increase their basis in the partnership assets to equal the basis in the acquired partnership interest. Doing this allows a buyer to avoid future tax liability and carries no adverse tax consequences to existing partners. The Court concludes that it is reasonable to expect a economically rational partnership and buyer to negotiate an I.R.C. § 754 election into the partnership acquisition.

16. The total discount applicable to Temple's Ladera Land gifts is 38%.

17. The FMV of Temple's 42.3343% Ladera Land gift to Buddy Temple is $940,077.

18. The FMV of Temple's 1.333% Ladera Land gifts to Ellen Temple and to Buddy Temple, as Trustee of the South Texas Land Trusts for the benefit of Temple's grandchildren, is $29,607.

### Valuation of the Boggy Slough Gifts

19. The Court finds a number of Plaintiff's Boggy Slough valuations to be well taken.

20. The government seeks to deny a discount for lack of control to the 76.6% Boggy Slough gifted interest to Charlotte Temple, contending that any partner with at least 51% ownership in Boggy Slough can dissolve the partnership. (Tr. 459–460).

21. Section 9.1C of the Boggy Slough agreement is key to the Court's analysis. It states that "[t]he Company shall dissolve upon the . . . vote of Members holding at least fifty one percent (51%) of the Membership Interests." It is necessary to review California law to determine whether a lack of control discount is appropriate for the 76.6% interest.

22. The Court has reviewed the California Limited Liability Company Act (the "Act"), which is codified in California Corporations Code Section 17001 *et seq*, and relevant case law. California Corporations Code Section 17250 and 15654 contemplate that partnership distributions may take the form of money or property. Additionally, California Corporations Code Section 15684 spells out the priority of distributions upon the winding up of a limited partnership. California Courts have expressly held that a partnership dissolution can take the form of distribution of real property in kind (as opposed to selling the assets). *See Logoluso v. Logoluso,* 233 Cal.App.2d 523, 43 Cal.Rptr. 678 (1965). The Court concludes, by a preponderance of the evidence, that a liquidation of Boggy Slough is not clearly mandated under California law.

23. The Court finds Lyon's calculation of the 76.6% Boggy Slough interest to be persuasive. *See* PX 86. Lyon's report lays out the numerous difficulties associated with valuing a concern like Boggy Slough, such as control (or lack thereof), relationships among partners, and the way the property is used. *See* PX 86, *see also* (Tr. 602–603). Based on Lyon's sales comparison approach, the Court concludes by a preponderance of the evidence that Tem-

ple's 76.6% Boggy Slough gifted interest should be subject to a 60% discount.

24. As for Charlotte Temple's listing of her Boggy Slough West interests on certain bank loan documents, the Court does not agree with the United States's argument that Charlotte's undiscounted loan document valuations demand no discount for Boggy Slough. When Charlotte, on behalf of Boggy Slough, obtained a bank loan of over a million dollars to improve and develop the California concern, she had no discounting expertise. The Court does not consider her bank loan documents for discount valuations, and instead relies upon the work of the experts retained to provide evidence in this matter.

25. The Court concludes that a discount for built-in gains is not applicable to Boggy Slough. *See* discussion of I.R.C. § 754 elections, infra.

26. On February 7, 1997, (the date of Temple's gifts), Boggy Slough's NAV was $2,189,581. *See* GX 32.

27. Using a 60% discount for the 76.6% Boggy Slough gifted interest to Charlotte Temple, the Court concludes the FMV for Temple's 76.6% Boggy Slough gifted interest te be $661,824.

28. The Court concludes a 33% combined lack of control/lack of marketability discount and a 7.5% incremental lack of marketability discount are appropriate. The total discount applied to the 1.6% Boggy Slough gifted interests to Temple's grandchildren is 38%.

29. The FMV for Temple's 1.6% Boggy Slough Gifted Interests is $21,712.

*Valuation of the Temple Partnership Gifts*

30. In valuing the stock owned by the Temple Partnerships, the average of the high and low price for the day of valuation is used in accordance with the Treasury Regulations under Section 2512.

Treas. Reg. § 25.2512–2(b) states that "[i]n general, if there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market or otherwise, the mean between the highest and lowest quoted selling prices on the date of the gift is the fair market value per share." This regulation does not appear to differentiate between valuing an outright gift of stock and valuing an interest in a partnership which owns stock. *See Estate of Cook v. Commissioner*, 349 F.3d 850 (5th Cir.2003)(Internal Revenue Code and supporting regulations are used for valuation purposes, notwithstanding the presence of a partnership as owner).

31. In calculating the minority interest discount for the Temple Partnership gifts, Burns properly examined transactions involving closed-end funds. Specifically, he relied on a published weekly list of closed end funds. *See* Tab 8 to Burns Expert Report—GX 53, and Tab 9 to Burns Expert Report—GX 72. The minority interests, which correspond to the published mean discounts to NAV, were correctly calculated as follows: April 11, 1997: 7.5%, June 5, 1997: 10.1%, and January 9, 1998: 3.3.%.

32. This method was used by the Tax Court in *Peracchio v. Commissioner*, 86 T.C.M. (CCH) 412 (2003). The court observed that this was "an approach we have previously followed in the context of investment partnerships . . . and we shall do so again here." (citing *McCord v. Commissioner*, 120 T.C. 358, 376–87, 2003 WL 21089049 (2003)).

33. The Court does find Temple's argument for determining the minority interest discount well taken. Elliot simply chose the discount represented by the 75th percentile of a restricted group of funds. Elliot excluded some funds, without explanation or justification, and did not exclude

funds using substantial leverage. (Tr. 384–385 and 388–389).

34. Finally, the Court determines the better approach to be Burns's assertion that any built-in capital gain present at the contribution of the assets to a partnership is generally allocated to the contributing partner. *See* I.R.C. § 704(c)(1) and Treas. Reg. § 1.704–3. The 6% minority interest discount calculated by Burns is warranted.

35. As for the lack of marketability discount, the Court finds Burns's methodology to be correct. In arriving at a valuation, Burns considered and relied upon the following: (i) restricted stock studies, (ii) academic research, (iii) the costs of going public, (iv) secondary market transactions, (v) asset liquidity, (vi) partnership interest transferability, and (vii) whether distributions were made. *See* GX 53, GX 72; (Tr. 419–420). The Court finds reliability in the fact that Burns endeavored to understand and incorporate the market dynamics of restricted stock sales.

36. Elliot used restricted stock sales but did not a analyze them as fully as Burns. Rather than taking restricted stock sale data and explaining its relation to the gifted interests, Elliot simply listed the studies and picked a discount based on the range of numbers in the studies. The Tax Court criticized this analytical approach in *Peracchio v. Commissioner,* 86 T.C.M. (CCH) 412 (2003). The better method is to analyze the data from the restricted stock studies and relate it to the gifted interests in some manner, as Burns did.

37. The Court concludes that the Temple Partners minority interest discounts, which were based on the mean discounts to NAV listed for the three valuation dates, are as follows: April 11, 1997: 7.5%, June 5, 1997: 10.1%, and January 9, 1998: 3.3% The Court further concludes that a marketability discount of 12.5% applies to the value of the Temple Partnerships gifted interests.

38. However, the Court concludes that a discount for built-in gains is not applicable to the Temple Partnerships gifted interests. I.R.C. § 754 allows a general partner to elect to increase a buyer's basis in the partnership assets to equal the basis in the acquired partnership interest. The buyer would thereby avoid future tax liability. After considering the nature of an arm's length negotiation, the fact that no adverse tax consequences would arise for pre-existing partners, and the fact that no significant administrative burdens arose from an I.R.C. § 754 election, Burns did not apply a discount for built-in gains. Elliot argued that there was only a 75% to 80% chance that such an election would be made but admitted that no undue administrative or tax burden would arise for existing partners. The Court chooses Burns's approach.

39. Elliot and Burns presented the Court with essentially the same arguments that they both made in *Estate of Jones v. Commissioner,* 116 T.C. 121, 2001 WL 233964 (2001). The Tax Court held that there is no discount for built-in capital gains because I.R.C. § 754 election administrative burdens were not substantial and because the hypothetical willing buyer and willing seller would likely resolve this issue prior to completing the transaction. *Id.* at 137–38, 2001 WL 233964. Additionally, after considering the relatively few types of assets owned by the Temple Partnerships, the Court is confident that a hypothetical willing buyer and willing seller would resolve the § 754 issue before completing the transaction, making a built-in capital gains discount inapplicable.

40. For the Temple Interests 1% gift to St. Cyprians on April 11, 1997, the Court concludes the NAV of Temple Inter-

ests to be $14,736,086. After discounting 7.5% for lack of control and 12.5% for lack of marketability, the fair market value for the Temple Interests 1% St. Cyprian's gift on April 11, 1997, is $119,270.

41. For the Temple Partners 1% gift to St. Cyprians on April 11, 1997, the Court concludes the NAV of Temple Partners to be $14,736,939. After discounting 7.5% for lack of control and 12.5% for lack of marketability, the fair market value for the Temple Partners 1% St. Cyprian's gift on April 11, 1997, is $119,276.

42. For the Temple Interests June 5, 1997 45% gifted interest to Buddy Temple, the Court concludes the NAV of Temple Interests to be $16,805,768. After discounting 10.1% for lack of control and 12.5% for lack of marketability, the FMV of the June 5, 1997, 45% gifted interest to Buddy Temple is $5,948,927.

43. For the Temple Partners June 5, 1997 45% gifted interest to Charlotte Temple, the Court concludes the NAV of Temple Partners to be $16,805,530. After discounting 10.1% for lack of control and 12.5% for lack of marketability, the FMV of the June 5, 1997, 45% gifted interest to Charlotte Temple is $5,948,843.

44. For the Temple Interests January 9, 1998, 44.24% gifted interest to Buddy Temple, the Court concludes the NAV of Temple Interests to be $17,622,470. After discounting 3.3% for lack of control and 12.5% for lack of marketability, the FMV of the January 9, 1998 44.24% gifted interest to Buddy Temple is $6,611,517.

45. For the Temple Partners January 9, 1998, 44.24% gifted interest to Charlotte Temple, the Court concludes the NAV of Temple Partners to be $17,704,956. After discounting 3.3% for lack of control and 12.5% for lack of marketability, the FMV of the January 9, 1998 44.24% gifted interest to Charlotte Temple is $6,627,421.

46. The Court determines the January 9, 1998 Temple Interests gifts to Ellen Temple and Temple's grandchildren to be $28,395.

47. The Court determines the January 9, 1998 Temple Partners gifts to Temple's grandchildren to be $28,463.

48. The following table is included to illustrate the Court's various gift valuations:

| Gift by Temple | Temple's Valuation | Value Calculated by the Court |
|---|---|---|
| **LADERA LAND, Ltd.** | | |
| 42.3343% to Buddy Temple | $ 631,725 | $ 940,077 |
| 1.33% Gifted Interests | $ 19,896 | $ 29,607 |
| | | |
| **BOGGY SLOUGH WEST, LL** | | |
| 76.6% Gift to Charlotte Temple | $ 691,727 | $ 661,824 |
| 1.6% Gifted Interests | $ 14,448 | $ 21,712 |
| | | |
| **TEMPLE INTERESTS, LP** | | |
| 1% Gift to St. Cyprians | $ 80,900 | $ 119,270 |
| 45% Gift to Buddy Temple | $4,254,000 | $5,948,927 |
| 44.24% Gift to Buddy Temple | $4,723,900 | $6,611,517 |
| 0.19% Gifted Interests | $ 20,290 | $ 28,395 |
| | | |
| **TEMPLE PARTNERS, LP** | | |
| 1% Gift to St. Cyprians | $ 80,900 | $ 119,276 |

| | | |
|---|---|---|
| 45% Gift to Charlotte Temple | $4,254,000 | $5,948,843 |
| 44.24% Gift to Charlotte Temple | $4,726,900 | $6,627,421 |
| 0.19% Gifted Interests | $ 20,300 | $ 28,463 |

49. Any finding of fact that is more properly considered a conclusion of law is incorporated.

## ORDER

**IT IS ORDERED** that a separate Judgment shall be rendered in this civil action.

**IT IS FURTHER ORDERED** that, by March 17, 2006, each party shall file a proposed Final Judgment in accordance with the Court's findings of fact and conclusions of law.

**SO ORDERED.**